******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAMES RAYNOR
## (AC 38348)

DiPentima, C. J., and Sheldon and Flynn, Js.

*Syllabus*

Convicted of assault in the first degree as an accessory and conspiracy to commit assault in the first degree, the defendant appealed to this court, claiming, inter alia, that the evidence was insufficient to support his conviction. The defendant's conviction stemmed from an incident in which the victim was beaten by a group of five men and shot in the back by J, a fellow gang member with the defendant. The defendant claimed that the evidence supported a finding that he was not present when the victim was shot, and that even if the jury found that he was present, there was no testimony establishing that he verbally ordered the shooting, encouraged J or provided J with the gun used in the shooting. He also claimed that his mere presence at the scene of the crime could not establish his liability as an accessory to the assault. *Held*:

1. The evidence was sufficient to support the defendant's conviction of assault in the first degree as an accessory, there having been sufficient evidence for the jury to have found beyond a reasonable doubt that the defendant aided J to cause the victim physical injury by discharge of a firearm: there was ample evidence from which the jury reasonably could have found that the defendant was present for the shooting of the victim, and from which it could have inferred that the defendant was armed with a gun, that he aided J by preventing the victim from leaving the immediate area and that the defendant participated in the physical beating of the victim immediately prior to the shooting, which belied the defendant's claim that he was merely present for the shooting; furthermore, there was sufficient evidence for the jury to have found, beyond a reasonable doubt, that the defendant intended that J commit assault in the first degree, as the evidence showed that the defendant, who was an enforcer for the gang, had the ability and motive to order other gang members to shoot rival drug dealers, including the victim, who was selling drugs at the time of the shooting, and that the defendant intentionally played an active and authoritative role in causing other gang members to come to the scene, to confront and ultimately to shoot the victim to deter him and others from selling drugs without the gang's permission in that area.

2. The defendant's conviction of conspiracy to commit assault in the first degree was supported by sufficient evidence, as the jury reasonably could have found that the defendant had entered into an agreement to commit assault in the first degree; the jury could have inferred from the evidence that the defendant, as an enforcer for the gang, was expected, and thus had a motive, to use force against unsanctioned drug dealers operating in the gang's area, including the victim, that the defendant had the motive to agree with other gang members to cause physical injury to the victim by means of the discharge of a firearm, that he played an active role in the planning and coordination of the assault of the victim and had arranged where the group would rendezvous after the assault was completed, and that he intended that a member of the conspiracy would cause physical injury to the victim by means of the discharge of a firearm, in light of testimony by witnesses that the defendant and two other gang members were armed with guns and the fact that the defendant did not summon medical assistance for the victim.

3. The trial court did not abuse its discretion by admitting into evidence certain uncharged misconduct evidence concerning the practices of the defendant's gang in selling drugs and enforcing its control over the drug trade in its territory, and regarding a shooting of another drug dealer, C, approximately eighteen hours after the victim was shot and in the same vicinity as the victim's shooting, which was admitted as evidence of the defendant's motive to use force and violence against the victim: this court declined to review the defendant's claim that the trial court abused its discretion by admitting the uncharged misconduct drug evi-

dence because it was not relevant to his motive or intent to harm the victim, or to conspire with or to aid others to do so, the defendant having failed to preserve that claim by objecting to the admission of that evidence on the ground of relevance or its prejudicial effect, and having failed to seek review of his unpreserved claim pursuant to *State* v. *Golding* (213 Conn. 233), or the plain error doctrine; moreover, the defendant's challenge to the admission of the uncharged misconduct evidence concerning the shooting of C was unavailing, as the defendant's claim that the evidence should not have been admitted because it was not relevant to his motive or intent to commit the charged offenses was not reviewable because he failed to object specifically on the ground of relevance to the admission of that evidence at trial, and, further, the trial court did not abuse its discretion in determining that the probative value of the evidence of C's shooting outweighed its prejudicial effect, as the defendant had reasonable grounds to anticipate the evidence, he was not unfairly surprised by the state's offer of the evidence at trial, the parties did not spend an undue amount of time addressing the evidence, it did not unduly distract the jury from the issues in the case, and the court took adequate measures to minimize its emotional impact on the jury.

4. The record was inadequate to review the defendant's claim that his constitutional rights were violated when the state used a peremptory challenge to strike a minority juror, R, without providing a sufficient race neutral explanation, in violation of *Batson* v. *Kentucky* (476 U.S. 79); the defendant did not preserve his claim of disparate treatment before the trial court, nor did he satisfy the requirements for review of the unpreserved claim under *State* v. *Golding* (213 Conn. 233), as the transcripts of the voir dire did not indicate the racial composition of the empaneled jury, and the record belied his assertion that there were adequate facts of record to demonstrate that the state, which excused R due to his employment history, engaged in racially disparate treatment by accepting other venirepersons, I and G, whom the defendant claimed were nonminority venirepersons with work restrictions similar to those of R; moreover, the trial court expressly noted that R was not of the same race as the defendant, there was nothing in the record demonstrating the personal race or ethnicity of R or I, and because the court expressly noted that G was an African-American female, the prosecution's acceptance of G but not R could not serve as evidence of the state's discriminatory use of peremptory challenges to exclude similarly situated minority persons from the jury.

Argued April 11—officially released August 15, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree as an accessory and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Mullarkey, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; verdict of guilty; subsequently, the court denied the defendant's motion to set aside the verdict and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, James Raynor, appeals from the judgment of conviction rendered against him following a jury trial on charges of accessory to assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5)[1] and 53a-8,[2] and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48[3] and 53a-59 (a) (5). On appeal, the defendant claims that (1) there was insufficient evidence to sustain his conviction as an accessory to assault in the first degree; (2) there was insufficient evidence to sustain his conviction of conspiracy to commit assault in the first degree; (3) the trial court abused its discretion in admitting uncharged misconduct evidence as evidence of the defendant's motive and intent to commit the crimes charged against him in this case; and (4) the court improperly denied the defendant's *Batson*[4] challenge to the state's exercise of a peremptory challenge during jury selection. We affirm the judgment of the trial court.

The jury was presented the following facts upon which to base its verdict. On the morning of July 24, 2009, Luis Torres (victim) traveled to 10 Liberty Street in Hartford to purchase heroin from an acquaintance, Alex Torres (Torres). At that time, Torres had known the victim for approximately nine months. Torres testified that on several prior occasions he had sold the victim small amounts of heroin, but on this occasion, for the first time, the victim purchased a large quantity of heroin, a total of 100 bags. When the victim was making this purchase, he told Torres that he intended to sell the drugs in front of the 24 Hour Store near the intersection of Albany Avenue and Bedford Street in Hartford. Upon hearing this, Torres told the victim "to be careful because it's . . . a bad neighborhood" and that he should "stay away from [that] area." After the victim made his purchase, he parted company with Torres and left Liberty Street.

Later that evening, the victim drove to New Britain and picked up his girlfriend's father, Miguel Rosado. Thereafter, in the early morning hours of July 25, 2009, the two men went to the 24 Hour Store on Albany Avenue to purchase beer and food. Upon arriving at the 24 Hour Store, Rosado and the victim spoke with two women, Adrienne Morrell and Karline DuBois, whom they believed to be prostitutes. After learning that they were not prostitutes, Rosado and the victim asked the women whether they could help them purchase "powder," or powder cocaine. Morrell and DuBois agreed, then got into the victim's car and directed the men to Irving Street in Hartford, where the victim purchased an unspecified quantity of cocaine. The four then returned to the 24 Hour Store in the victim's car.

Upon returning to the 24 Hour Store, the victim displayed a bag of heroin to DuBois and asked her if she knew "where he could get rid of it," from which DuBois understood him to mean that "[h]e wanted to sell it." DuBois informed the victim that she did not use heroin, and thus she did not know where the victim could sell his drugs. DuBois then stated that she was going "back upstairs" to the apartments above the 24 Hour Store, where local people often gathered to use drugs. The victim asked DuBois if he could join her, but DuBois warned him that he should stay downstairs because "[p]eople don't know you . . . ." Ignoring this warning, the victim stated that he was going to go upstairs with DuBois, to which she responded, "Then you're on your own."

Thereafter, the victim, Rosado, Morrell, and DuBois all went upstairs to the apartments above the 24 Hour Store. DuBois recalled that when they reached the apartments, six or seven people were already there, playing cards and getting high. After they entered, Morrell, DuBois and Rosado began to smoke crack cocaine. At the same time, the victim, who was very drunk, began offering heroin to the other occupants of the apartment. As DuBois had predicted, "[n]obody [in the apartment] wanted anything to do with [the victim] because nobody knew him." Shortly after the victim's arrival, a group of three men entered the apartment. DuBois recognized two of the three men as Altaurus Spivey, whom DuBois knew as "S," and Joseph Ward, whom she knew as "Neutron." Although DuBois did not identify the third man by name, she described him as a "bigger black guy."

Upon entering the apartment, the three men approached the victim, and S asked, "What are you doing here?" DuBois agreed with the prosecutor's statement that S spoke to the victim "in a tough guy type of way," which she interpreted to mean, "you don't belong up here. . . . [Y]ou're not going to get rid of nothing. Nobody knows you. Just go." DuBois recalled feeling a growing tension between the groups and fearing that "there was going to be a big problem." Thereafter, according to DuBois, S and his group left the apartment, followed a few minutes later by the victim and an unidentified female, who went downstairs together and outside through the back door of the building to the area behind the 24 Hour Store. As this was occurring, at approximately 2 a.m., Dubois, Rosado, and Morrell remained inside the apartment.

Several witnesses testified that the 24 Hour Store was often busy at and after 2 a.m. because it was the only store in the area that was open at that time. People would therefore go there to purchase food and drinks after the nearby bars and clubs had closed for the evening. Indeed, Officer Steven Barone of the Hartford Police Department testified that the 24 Hour Store was known by law enforcement as a "nuisance spot," where

there was always a high volume of foot traffic and criminal activity between 2 and 4 a.m. Consistent with Barone's testimony, several witnesses stated that many people were both inside and outside of the 24 Hour Store in the early morning hours of July 25, 2009.

One regular patron, Marc Doster, who lived on Albany Avenue in an apartment adjacent to the 24 Hour Store, was familiar with people who lived in or frequented the area around Bedford Street and Albany Avenue, including the defendant, who was known on the streets as "Ape." Doster testified that, in the early morning of July 25, 2009, as he was walking from his apartment to the 24 Hour Store, he was approached by the defendant, who asked him if he either knew or was affiliated with the man who was selling drugs behind the 24 Hour Store. Doster stated that he did not. The defendant then told Doster, "don't worry about it," because he was going "to pay [the man] a visit . . . talk to him." Doster then recalled that, just minutes after this conversation, he saw someone with a gun in his hand running toward the back of the 24 Hour Store. Although Doster could not see the face of the man with the gun because the man was wearing black clothing and had covered his face, he observed that the man was short and heavyset, with a body size and shape that resembled the defendant.

As these events were transpiring, another regular patron of the 24 Hour Store, Tyrell Mohown, who had met the victim for the first time that evening, entered the store and purchased a cigar so that he and the victim could smoke marijuana together. After making his purchase, however, when Mohown went behind the 24 Hour Store to meet the victim, he saw the victim surrounded by five men, including Neutron and John Dickerson, nicknamed "Jerk." Mohown testified that although he did not see the defendant or S in that group, he recalled that at least two of the five men had covered their faces with bandanas. Shortly after he came upon the scene, Mohown saw Neutron strike the victim with a baseball bat several times in the upper body. The other men then began punching and kicking the victim, who collapsed on the ground. Mohown then saw Jerk take out a gun and fire one round into the victim's back before the group scattered in different directions. The victim, still conscious but unable to walk, stated that he thought he was about to die and asked Mohown to call an ambulance. Mohown returned to the 24 Hour Store and used a pay phone to report the shooting but, not wanting to get involved, did not identify the shooter.

Another witness, Sonesta Reynolds-Campos (Campos),[5] was standing on Bedford Street near the 24 Hour Store when she heard a gunshot from the area behind the store. Upon hearing the gunshot, Campos directed her attention to that area, where she saw a group of approximately six men. Campos recalled that

S, Jerk, Neutron, and the defendant were all in the group, and that the defendant was then wearing a hoodie and holding what appeared to be a gun.

At approximately 2:25 a.m., the Hartford police received reports of gunshots fired near the intersection of Bedford Street and Albany Avenue. Within minutes of receiving such reports, several Hartford police officers responded to the scene. Officer Barone, one of the first officers to respond, made efforts to secure the scene while other officers tended to the victim. At that time, officers saw multiple lacerations on the victim's face and discovered a single gunshot wound to his back. The victim was then transported to a hospital, where it was determined that the bullet had struck his spine, paralyzing him. Due to the inherent complications of removing the bullet from the victim's spine, physicians were unable to remove the bullet, and thus officers were unable to conduct forensic testing on the bullet at that time.[6]

Several days after the shooting, Campos encountered the defendant on Bedford Street. During that encounter, the defendant told Campos, "[I'm] sorry you had to see it," but "[I] had to make an example of him." Although Campos did not ask the defendant what he meant by those remarks, she interpreted them to refer to the recent shooting of the victim behind the 24 Hour Store.

On January 7, 2014, at the conclusion of a lengthy investigation of the July 25, 2009 shooting by a state investigating grand jury,[7] the defendant was arrested in connection with the shooting. Thereafter, by way of a long form information, the state charged the defendant with conspiracy to commit assault in the first degree and with being an accessory to assault in the first degree, on which he was later brought to trial before the court, *Mullarkey, J.*, and a jury of six. The state presented its case-in-chief on November 7, 10, and 12, 2014. On November 12, at the conclusion of the state's case-in-chief, the defendant moved for a judgment of acquittal on both charges. That motion was denied by the court. On November 17, 2014, the jury returned a verdict of guilty on both charges. The following week, on November 21, 2014, the defendant filed a motion to set aside the verdict on the grounds that the verdict was against the weight of the evidence and that the court abused its discretion in admitting evidence of uncharged misconduct. The defendant's motion was subsequently denied by the court. On February 5, 2015, the defendant was sentenced to a total effective term of thirty-seven years of incarceration to be followed by three years of special parole. Thereafter, the defendant filed the present appeal. Additional facts will be set forth as necessary.

I

SUFFICIENCY OF THE EVIDENCE

On appeal, the defendant claims that there was insufficient evidence to sustain either his conviction of accessory to assault in the first degree or his conviction of conspiracy to commit assault in the first degree.[8] We are not persuaded.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts.[9] In July, 2009, the area surrounding Bedford and Brook Streets was under the control of Money Green Bedrock (MGB), a neighborhood street gang. MGB was known to traffic in and sell drugs, including heroin and crack cocaine, throughout the area. Members of MGB included, inter alia, S, Neutron, Jerk, and the defendant. Campos testified that she routinely purchased drugs from the defendant for her own use, and was often asked to "test" the purity of the gang's heroin. As a result of these activities, Campos became acquainted with the defendant and familiar with the defendant's role within MGB, and gained his trust.

According to Campos, only members of MGB were permitted to sell drugs in the area around Bedford Street, and drug dealers who did not live in the area were not allowed to do business in the area. In order to enforce their control over this territory, the members of MGB shared certain duties, including conducting drug sales, acting as lookouts, and monitoring the area to make sure no one from outside the group was "hustling on the block . . . ." Several witnesses testified that the defendant had a position of authority within MGB, and was considered an "enforcer" for the gang. According to one witness, Ladean Daniels, the defendant "gave orders, and the people who [are] in that area abide by them." Similarly, Doster testified that the defendant would "handle problems . . . [p]atrol the area . . . [and] [e]nforce the rules . . . ."

As a result of the gang's assertion of control over drug selling activity in the Bedford Street area, several witnesses, who were also admitted drug dealers, testified that they either did not sell drugs in that neighborhood, because they were not from there, or that they were permitted to sell drugs on MGB's turf because they lived in the neighborhood. Drug dealers in the latter group, including Daniels,[10] operated in the area with the understanding that they would either pay MGB a portion of their profits or purchase the drugs they sold directly from the gang. According to DuBois, it was known throughout the neighborhood that drug dealers who did not abide by these rules would be "dealt with" by MGB.

The state introduced testimony from several witnesses to the shooting of the victim behind the 24 Hour Store on July 25, 2009. In the state's case-in-chief, Rosado testified that, when he and the victim returned to the 24 Hour Store from Irving Street, he saw the

victim speak with a man known as S, whom the victim claimed to have known from the area. Although Rosado could not remember the exact words that the victim used, he recalled the victim saying that he intended either to purchase marijuana from S or to sell some marijuana to S that night. The jury also heard testimony from Mohown, who stated that he had met the victim for the first time on the evening prior to the shooting and that, prior to the shooting, he had agreed to smoke marijuana with the victim behind the 24 Hour Store.

Doster testified, as previously noted, that, "a couple minutes before . . . the incident happened," the defendant approached him and asked him if he knew or was associated with the man who was selling drugs behind the 24 Hour Store. When Doster said that he did not know the man, the defendant informed him that he was "going to go talk to [that man] and handle it." Doster further testified that, shortly after he and the defendant had that conversation, he saw someone who resembled the defendant running toward the back of the 24 Hour Store holding a gun. Furthermore, Campos testified that, upon hearing gunshots, she observed the defendant standing near the victim, wearing a hoodie and holding a gun. This testimony was corroborated by Daniels, who also claimed to have been near the 24 Hour Store in the early morning hours of July 25, 2009. Daniels stated that, although he did not see who shot the victim, he walked behind the store after hearing gunshots in the area and, at the time, saw the defendant and another man nicknamed "Hollywood" holding guns and standing near the victim, who was lying on the ground. Additionally, several witnesses testified that the group of men who had surrounded the victim during the incident scattered and ran away in different directions after the victim was shot.

Daniels further testified that, when he reencountered the defendant near the 24 Hour Store minutes after the shooting and asked him what had happened, the defendant stated, "[d]ude keep coming in the area trying to hustle." Daniels also testified that, after he had returned to the 24 Hour Store and purchased a sandwich, he walked to an apartment building on Brook Street, which runs parallel to Bedford Street. As he arrived at the apartment building, Daniels came upon the group of men he had seen surrounding the victim behind the 24 Hour Store. According to Daniels, the defendant, Jerk, S, and another man were gathered in the yard behind the apartment building. At that time, Daniels overheard the defendant tell the men "to stay off the block and keep their eyes open because that was their work," then warning them to be careful because "the block was hot." Finally, Campos testified that when she spoke with the defendant several days after the shooting, he apologized to her for her having to witness the shooting, but explained to her that he "had to make an example of him."

In addition to this evidence, the state introduced, as part of its case-in-chief, evidence of the defendant's involvement, later on that same day, in arranging the shooting of another drug dealer who was selling drugs without permission on MGB's turf.[11] This evidence was offered, over the defendant's objection, to prove his motive and intent to participate in the earlier shooting of the victim behind the 24 Hour Store. On the basis of that evidence, the jury reasonably could have found that, on the night of July 25, 2009, approximately eighteen hours after the victim in this case was shot, another drug dealer, Kenneth Carter, was shot multiple times in the chest on Liberty Street in Hartford, approximately one block away from Bedford Street.[12] After the police had secured the scene of the later shooting, officers recovered, from the interior of Carter's vehicle, a large clear bag filled with small, individually wrapped packages of a green, leafy substance suspected of being marijuana. The officers also found and lifted several latent fingerprints from the outside of the driver's side door of Carter's vehicle. When those fingerprints were entered into the AFIS[13] database, they were found to match known fingerprints on file for Kendel Jules, nicknamed "Jock," who was a known affiliate of MGB.

Thereafter, Sergeant Andrew Weaver of the Hartford Police Department testified to his analysis of the cell phone records associated with the cell phones of Carter, the defendant, and Jock.[14] Weaver testified that the cell phone records revealed that the defendant had initiated contact with Carter at 10:10 p.m. that evening and had called him several times over the next thirty minutes, including one call at 10:39 p.m., approximately ten minutes before Carter was shot. Weaver also testified that a call had been placed from the defendant's cell phone to Jock's cell phone approximately seven minutes before Carter was shot. On the basis of his analysis of such call records and the associated cell phone tower, Weaver testified that, at the time of the defendant's final call to Jock before the Carter shooting, Jock's cell phone was in the area of Liberty Street, moving in the general direction of the location of Carter's vehicle.

Thereafter, the state presented additional testimony from Daniels, who claimed that he had been present for a conversation between the defendant, Jerk, and Jock in the days following the Carter shooting. Daniels testified that on that occasion, he had gone to the defendant's apartment on Bedford Street to purchase drugs. He further testified that, within three or four minutes of his arrival, the defendant and Jerk began "mocking [Jock about] how he was nervous and afraid when he was supposed to shoot the dude." Although Daniels did not know who the group was referring to, the defendant indicated that the person who was shot "[kept] coming down [here] hustling and he was meeting people in that

back street." Daniels also testified that the three men described how they had split up and deployed themselves before the Carter shooting. According to Daniels, the defendant patrolled the area of Garden Street to make sure the coast was clear, while Jock walked to Liberty Street and Jerk positioned himself on Brook Street. The defendant also said that the shooting was "[Jock's] initiation into the block" and that "if Jock [couldn't] get the job done, Jerk was [there] to help . . . ."

With these additional facts in mind, we turn to our standard of review. "It is well settled that a defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether

there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Citation omitted; internal quotation marks omitted.) *State* v. *Chemlen*, 165 Conn. App. 791, 816–18, 140 A.3d 347, cert. denied, 322 Conn. 908, 140 A.3d 977 (2016). "[T]he trier of fact may credit part of a witness' testimony and reject other parts. . . . [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 149 Conn. App. 41, 46, 87 A.3d 1150, cert. denied, 312 Conn. 907, 93 A.3d 158 (2014).

With these legal principles in mind, we address each the defendant's sufficiency claims.

### A

### Accessory to Assault in First Degree

The defendant first claims that there was insufficient evidence to sustain his conviction as an accessory to assault in the first degree in violation of §§ 53a-59 (a) (5) and 53a-8. "It is well established in this state that there is no such crime as being an accessory. . . . Rather, the accessory statute, General Statutes § 53a-8, merely provides an alternative theory under which liability for the underlying substantive crime may be proved." (Citation omitted; internal quotation marks omitted.) *State* v. *Hopkins*, 25 Conn. App. 565, 568–69, 595 A.2d 911, cert. denied, 220 Conn. 921, 597 A.2d 342 (1991). "[Section] 53a-8 (a) provides: A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." (Internal quotation marks omitted.) *State* v. *Hines*, 89 Conn. App. 440, 447, 873 A.2d 1042, cert. denied, 275 Conn. 904, 882 A.2d 678 (2005). To convict a defendant of a crime on the theory of accessorial liability under this statute, the state must prove both that a person other than the defendant acting as a principal offender, committed each essential element of that crime, and that the defendant, acting with the mental state required for the commission of that crime, solicited, requested, commanded, importuned or intentionally aided the principal offender to engage in the conduct constituting that crime. "Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] . . . did some act which . . . directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Internal quotation marks omitted.) Id.; see also *State* v. *Diaz*,

237 Conn. 518, 543, 679 A.2d 902 (1996). A person is guilty of assault in the first degree under § 53a-59 (a), as a principal offender, "when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm." Thus, to prove a person guilty as a principal of assault in the first degree, the state must prove beyond a reasonable doubt that (1) the person caused physical injury to another person; (2) that he did so while acting with the intent to cause physical injury to the other person or a third person; and (3) that he caused such physical injury to the other person by means of the discharge of a firearm. See *State* v. *Collins*, 100 Conn. App. 833, 843, 919 A.2d 1087, cert. denied, 284 Conn. 916, 931 A.2d 937 (2007).

In light of those requirements of proof to establish a person's guilt as a principal offender under § 53a-59 (a) (5), establishing a defendant's guilt as an accessory to that offense under §§ 53a-59 (a) (5) and 53a-8 requires proof of the following essential elements: (1) that the principal offender violated § 53a-59 (a) (5) by causing physical injury to another person by means of the discharge of a firearm while acting with the intent to cause physical injury; (2) that the defendant solicited, requested, importuned or intentionally aided the principal offender to engage in the conduct by which he violated § 53a-59 (a) (5); and (3) that when the defendant intentionally aided the principal offender to engage in such conduct, the defendant was acting with the intent to cause physical injury to another person.

At the outset, we note that the parties agree that the victim was, in fact, physically injured by means of the discharge of a firearm by a principal offender other than the defendant, to wit; the defendant's fellow gang member, Jerk. They agree as well that, when Jerk shot the victim in the back after he and others had beaten and kicked him, he was committing the offense of assault in the first degree in violation of § 53a-59 (a) (5). The defendant argues, however, that there was insufficient evidence to sustain his conviction as an accessory to assault in the first degree because the state failed to prove beyond a reasonable doubt that, while acting with the intent to cause physical injury to the victim, he requested, commanded, or aided another to cause physical injury to the victim by means of the discharge of a firearm.

In support of his argument, the defendant asserts that at least one eyewitness, Mohown, had testified that the defendant was not present when the victim was shot. The defendant further argues that, even if the jury were to have credited other witnesses who placed him at the scene of the shooting, there was no testimony that the defendant verbally ordered the shooting, encouraged the shooter to shoot, or provided the shooter with the gun used in the shooting. The defendant thus argues

that the evidence adduced at trial, even when viewed in the light most favorable to the state, proved that he merely was present when the shooting occurred, but that a person's mere presence at the scene of a crime does not, by itself, establish that person's liability as an accessory to the commission of that crime.

The state disagrees, asserting that the jury was given ample circumstantial evidence from which it reasonably could have inferred that the defendant solicited, ordered, and/or intentionally aided Jerk to assault the victim by discharging a firearm. In support of its position, the state relies, more particularly, upon the following evidence: that the defendant was affiliated with the MGB, a gang of drug sellers who attempted to control all drug selling activity in the area of Bedford Street and Albany Avenue; that the defendant was "an enforcer" of the gang's drug selling monopoly in the area; that the defendant had made statements to Doster before the shooting, indicating that he personally was "going to go talk to" the victim, whom he referred to as the man selling drugs behind the 24 Hour Store, and thereby "handle" the problem arising from the victim's unwelcome presence and activity on MGB turf; that several MGB members accosted the victim inside of the apartments above the 24 Hour Store shortly before the shooting; that the defendant, while armed with a gun, joined with several other MGB members in confronting and surrounding the victim just before he was beaten, kicked, and ultimately shot in the back; that the defendant made inculpatory statements to Daniels about the shooting just minutes after it occurred; and that the defendant made inculpatory statements to Campos days after the shooting, apologizing to her for her having witnessed the shooting but explaining why it had happened, specifically, that he needed "to make an example" of the victim. The state thus argues that the record is replete with evidence from which the jury reasonably could have found that the defendant was guilty as an accessory to the commission of assault in the first degree.

Viewing the evidence in the light most favorable to sustaining the conviction, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant aided the principal shooter to cause the victim physical injury by discharge of a firearm, and thus to commit assault in the first degree. See *State* v. *Bennett*, 307 Conn. 758, 766, 59 A.3d 221 (2013). First, although the defendant's presence at the scene of the shooting is not a necessary factual predicate to accessorial liability, there was ample evidence from which the jury reasonably could have found that the defendant was present for the shooting of the victim. See, e.g., *State* v. *Conde*, 67 Conn. App. 474, 486, 787 A.2d 571 (2001) ("[o]ne may be an accessory even though he [was] not present" for commission of crime [internal quotation marks omitted]), cert. denied, 259

Conn. 927, 793 A.2d 251 (2002). Although Mohown claimed that he did not see the defendant in the group of men that attacked the victim that night, the defendant fails to recognize that the jury was free to "credit part of [Mohown's] testimony and reject other parts." (Internal quotation marks omitted.) *State* v. *Grant*, supra, 149 Conn. App. 46. In that respect, the jury reasonably could have found that Mohown's testimony that at least two men in that group were wearing bandanas over their faces supported Doster's testimony that he saw someone whom he believed to be the defendant, with his face covered, running toward the back of the 24 Hour Store with a gun in his hand moments before the shooting occurred. See *State* v. *Allen*, 289 Conn. 550, 559, 958 A.2d 1214 (2008) ("[i]f there is any reasonable way that the jury might have reconciled the conflicting testimony before them, we may not disturb their verdict" [internal quotation marks omitted]). Furthermore, both Campos and Daniels testified that moments after the shooting, they observed the defendant standing near the victim, holding a gun. Thus, the jury reasonably could have found that the defendant was, in fact, present for the shooting of the victim.

The defendant maintains, however, that even if the jury found that he was present for the shooting, mere presence, by itself, is insufficient to support a finding that the defendant aided the principal offender. See, e.g., *State* v. *Conde*, supra, 67 Conn. App. 486. Although we agree with that general statement of law, the defendant overlooks that the jury reasonably could have credited the testimony of Doster, Campos, and Daniels, each of whom testified that the group of men surrounded the victim, the defendant was standing near the victim and holding a gun in his hand, and that, while S struck the victim with a bat, the other men punched and kicked the victim before he was shot. From this evidence, the jury reasonably could have inferred that the defendant was armed with a gun, prevented the victim from leaving the immediate area, and participated in the physical beating of the victim immediately prior to the shooting. Such an inference belies the defendant's claim that he was "merely present" for the shooting. To the contrary, it permits a reasonable inference that the defendant aided the principal by preventing the victim from leaving the area and, as a result of the physical beating, immobilizing the victim before he was shot in the back.

As discussed in the preceding paragraphs, however, the evidence must demonstrate not only that the defendant aided the principal, but that such aid was provided with "criminal intent and community of unlawful purpose with the perpetrator of the crime . . . ." (Internal quotation marks omitted.) *State* v. *Sargeant*, 288 Conn. 673, 680, 954 A.2d 839 (2008). "To act intentionally, the defendant must have had the conscious objective to cause the [desired result] . . . . Intent is generally proven by circumstantial evidence because direct evi-

dence of the accused's state of mind is rarely available. . . . [T]he defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Citation omitted; internal quotation marks omitted.) *State* v. *Bennett*, supra, 307 Conn. 766.

Viewing the evidence in the light most favorable to sustaining the conviction, we conclude that there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the defendant intended that the principal commit assault in the first degree. First, the jury reasonably could have credited testimony that the defendant was an "enforcer" for MGB who held a position of authority within the gang. That testimony, combined with Daniels' testimony that the defendant stated that the Carter shooting was Jock's initiation into the gang and that Carter had been shot because he "[kept] coming down there hustling and . . . meeting people in that back street," supports an inference that the defendant had the ability and motive to order other members to shoot rival drug dealers, including the victim in this case. The jury also could have credited Doster's testimony that, minutes before the shooting, the defendant told him that he "was going to talk to [the man dealing drugs behind the 24 Hour Store] and handle it." Given the organization's motive to use deadly force against unwelcome drug dealers as a means of enforcing the gang's exclusive control over drug sales in the Bedford Street area, the jury reasonably could have inferred that the defendant's comments prior to the shooting in this case, in addition to the testimony that the defendant was holding a gun in his hand before the shooting, demonstrated the defendant's intent to use or to have someone else use a firearm to assault the victim. As discussed in the preceding paragraphs, "[t]he trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Garner,* 270 Conn. 458, 472, 853 A.2d 478 (2004).

Finally, the jury heard evidence about inculpatory statements made by the defendant in the minutes and days following this shooting. For instance, Daniels testified that, minutes after the shooting, when he asked the defendant what had led to the shooting, the defendant responded, "[d]ude keep coming in the area trying to hustle." Similarly, Campos testified that, several days after the shooting, the defendant made unsolicited statements to her, apologizing that she "had to see [that]" and explaining that "he had to make an example

out of [the victim]." On the basis of such evidence, the jury reasonably could have found that the defendant intentionally played an active and authoritative role in causing other gang members to come to the scene, to confront the victim, and ultimately to shoot him to teach him and others the lesson that they were not to sell drugs without permission on MGB's turf. Accordingly, viewing the evidence in the light most favorable to sustaining the conviction, the jury reasonably could have found that "the cumulative effect of all the evidence [proved] the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Chemlen*, supra, 165 Conn. App. 817.

## B

### Conspiracy to Commit Assault in First Degree

The defendant next claims that there was insufficient evidence to sustain his conviction of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (5).

"To establish the crime of conspiracy, it must be shown that an agreement was made to [commit assault in the first degree], that the conspirators intended [the victim be physically injured by means of the discharge of a firearm] and that the agreement was followed by an overt act in furtherance of the conspiracy. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Internal quotation marks omitted.) *State* v. *Blaine*, 168 Conn. App. 505, 511, 147 A.3d 1044 (2016). "While the state must prove an agreement [to commit assault in the first degree], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Internal quotation marks omitted.) *State* v. *Grant*, supra, 149 Conn. App. 46–47. "[W]hen determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain. . . . Accordingly, the defendant's state of mind may be proven by his conduct before, during and after the shooting." (Citation omitted; internal quotation marks omitted.) *State* v. *Wil-*

*liams*, 94 Conn. App. 424, 433, 892 A.2d 990, cert. denied, 279 Conn. 901, 901 A.2d 1224 (2006).

On appeal, the defendant asserts that there was insufficient evidence to support the state's theory that he "got the ball rolling" and agreed with the shooter to commit assault in the first degree. In support of this position, he argues that the record lacks any evidence that he entered into an agreement with the shooter, or that he ordered or encouraged the shooter to commit the crime of assault in the first degree. Moreover, the defendant contends that there was a substantial lapse of time between his alleged statement to Doster about "going to go talk to . . . and handle" the person behind the 24 Hour Store and the time of the shooting.[15] The defendant further asserts that his postshooting statements to Campos "did not prove that [he] had anything to do with the crime; they are simply statements expressing his opinion and are not inculpatory." As such, the defendant argues that "it is just as likely [that] the defendant's brother, who was also a 'leader,' or any other member [of MGB] who was an 'enforcer,' got the 'ball rolling' or conspired with the shooter." The defendant thus argues that any inference that he conspired with the shooter was unreasonable and unsupported by the evidence, and that the jury's verdict was the product of "speculation and conjecture."

Viewing the evidence in the light most favorable to sustaining the conviction, we conclude that there was sufficient evidence from which the jury reasonably could have found that the defendant entered into an agreement to commit assault in the first degree.[16] As discussed in the preceding paragraphs, the jury was presented with evidence concerning the Carter shooting on Liberty Street. From that evidence, the jury reasonably could have inferred that the defendant, as an "enforcer" for MGB, was expected to, and thus had motive to, use force against unsanctioned drug dealers operating in the area of Bedford Street and Albany Avenue, including the victim. In fact, the jury heard testimony that the defendant provided nearly identical reasons, consistent with that motive, for the Carter shooting and the shooting of the victim in this case. As to Carter, the defendant explained to Daniels that he had been shot because he "[kept] coming down there hustling, and he was meeting people in that back street"; similarly, as to the victim in this case, the defendant stated that the shooting had occurred because "[the] dude [kept] coming in the area trying to hustle." Additionally, Doster testified that just a few minutes before the victim was shot, the defendant approached him and asked if he knew or was affiliated with the man selling drugs behind the 24 Hour Store. When Doster stated that he did not know who was selling drugs behind the store, the defendant told him not to "worry about it" because he was "going to go talk to [the person dealing drugs behind the store] and handle it." From this evi-

dence, the jury reasonably could have inferred that the defendant had a motive to agree with other MGB members to cause physical injury to the victim in this case by means of the discharge of a firearm.

Moreover, the jury was presented with evidence and testimony from which it reasonably could have inferred that the defendant not only had motive to enter into a conspiracy, but that he played an active role in the planning and coordination of the assault of the victim. For instance, Rosado testified that S, a known member of MGB, spoke to the victim and planned to either purchase marijuana from him or to sell marijuana to him before the shooting. That testimony, coupled with Mohown's testimony that he intended to meet the victim behind the 24 Hour Store to smoke marijuana, would support a reasonable inference that S, someone known by Daniels to follow the defendant's orders, had attempted to lure the victim behind the 24 Hour Store where other MGB members were waiting to confront him. Indeed, this point was raised during the state's closing argument, wherein the prosecutor asked the jury to scrutinize the defendant's assertion that there was no agreement between the defendant and the shooter that evening and, in so doing, to consider whether it was mere coincidence that the defendant and four other members of MGB arrived at the same time, at the same location behind the 24 Hour Store, then joined together in beating the victim before one of their number shot him, or whether this was circumstantial evidence that the group had coordinated the confrontation with an interloping drug dealer on their gang's turf. Furthermore, the jury heard testimony from several witnesses that after the victim was shot, the group of men scattered and ran off in different directions, but that several minutes later, they reconvened in a different location behind a building on Brook Street, where the defendant instructed them to be careful because "the block was hot." In crediting that testimony, the jury reasonably could have inferred that the defendant had arranged where the group would rendezvous after the assault was completed and, from that reasonable inference, it also could have inferred that the assault had been orchestrated, at least in part, by the defendant. See *State* v. *Vessichio*, 197 Conn. 644, 657, 500 A.2d 1311 (1985) (holding that although evidence of conspiracy "not overwhelming," jury reasonably could rely on evidence that defendant picked up coconspirators in van after completed drug sale to support finding that defendant was involved in conspiracy to sell cocaine), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986); see also *State* v. *Stellato*, 10 Conn. App. 447, 454, 523 A.2d 1345 (1987) (jury may rely on defendant's conduct prior to, during, and *after* completed crime to infer defendant was member of conspiracy).

Next, we conclude that there was sufficient evidence

from which the jury reasonably could have found that the defendant intended that a member of the conspiracy cause physical injury to the victim by means of the discharge of a firearm. We reiterate that the jury heard evidence concerning the Carter shooting and, from that evidence, reasonably could have inferred that the defendant had both the motive and the ability to order other MGB members to shoot rival drug dealers as a means of exercising exclusive control of drug sales in the area of Bedford Street and Albany Avenue. Additionally, Doster testified that a few minutes after he spoke with the defendant, he observed someone of the defendant's height and shape wearing dark clothing, holding a gun, covering his face, and running toward the area behind the 24 Hour Store. From this testimony, the jury reasonably could have inferred that it was the defendant whom Doster had observed, and that the defendant was holding a gun and had taken steps to conceal his identity from potential witnesses to the shooting. The jury also heard from several witnesses that the defendant, Jerk and Hollywood were armed with guns and, from such evidence, reasonably could have inferred that the defendant intended that at least one member of the conspiracy would discharge a gun during the assault of the victim. Last, the jury reasonably could have considered the fact that the defendant did not summon medical assistance for the victim and, from that evidence, inferred that the defendant intended to cause physical injury to the victim by means of the discharge of a firearm. See *State* v. *Fuller*, 58 Conn. App. 567, 575, 754 A.2d 207, cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000).

"When determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 94 Conn. App. 433. "[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Chemlen*, supra, 165 Conn. App. 816. Accordingly, we conclude that, in viewing the evidence in the light most favorable to sustaining the conviction, there was sufficient evidence to support the jury's finding that the defendant was guilty of conspiracy to commit assault in the first degree.

## II

### UNCHARGED MISCONDUCT EVIDENCE

The defendant next claims that the court abused its discretion in admitting uncharged misconduct evidence related to (1) MGB's practices of selling drugs and

enforcing its exclusive control over the drug trade in its territory, and (2) the Carter shooting, as evidence of the defendant's motive to use force and violence against the victim in this case. The defendant asserts that such evidence was not relevant but, even if it had some probative value, its probative value was substantially outweighed by its prejudicial effect. For the sake of continuity, we adopt the court's and parties' references to these separate forms of uncharged misconduct as "the drug evidence" and "the Carter evidence."

The following factual and procedural history is necessary for our resolution of these claims. On November 5, 2014, two days before trial, the court held a hearing on the state's motion to admit other crimes evidence. At the hearing, the state indicated that it intended to offer evidence as to "the defendant's drug trafficking in the area in question . . . his control of the area . . . his association with a gang known as [MGB] . . . and the enforcement of that area from individuals who would encroach on that drug trafficking turf." The state further indicated at that time that it intended to offer the Carter evidence during its case-in-chief.

In support of its motion, the state made the following offer of proof: as a matter of logistics, the state intended to devote the first two days of trial to presenting evidence of the shooting of the victim in this case. Thereafter, on the third day of evidence, it would present the Carter evidence. Such evidence would include testimony from Officer Michael Creter, the first Hartford police officer to respond to the scene of the Carter shooting, and Detective Claudette Kosinski, who, while processing the vehicle in which Carter was shot, recovered latent fingerprints that ultimately were linked to MGB member Jock. The state also stated that it intended to present testimony from Vachon Young, who had spoken to Carter minutes before the shooting. The state claimed that Young would testify that Carter had told him that he "was going to the area of Liberty Street to sell the defendant some drugs." The state then indicated that it would call Daniels to testify about the conversation he overheard while inside the defendant's apartment several days after the Carter shooting, in which the defendant acknowledged his planning of the Carter shooting, which he described as Jock's initiation into the gang. In addition, the state indicated that it would call Rosado to testify that just before the victim was shot, "an identified associate or coconspirator, [S], asked [the victim] to go to the back of the 24 hour Store so that he could buy [drugs] from [the victim]." The state thus argued that the setup of the victim's shooting, inducing the victim, through S, to go behind the 24 Hour Store either to sell or buy drugs, was "strikingly similar" to the defendant's conduct before the Carter shooting, whereby the defendant "[summoned Carter] to the Liberty Street area so that he could buy from him."

The state next indicated that it would call James Stephenson, a former supervisor in the state forensics laboratory, who would testify that he compared the bullets used in the Carter shooting with the bullet recovered from the victim,[17] and concluded by forensic analysis that the same firearm had been used in both shootings. Last, the state indicated that it would present the testimony of Weaver, who would discuss the cell phone records of the participants in the Carter shooting and the associated cell tower logs.

In response to this offer of proof, defense counsel informed the court that, although he had received the police reports submitted by the state months before the trial, the state's written notice of intent to admit such evidence was vague because it failed to specify what subsection of the Connecticut Code of Evidence the state was relying upon to establish its admissibility. Without a more definite statement from the prosecutor as to the applicable subsection of the Connecticut Code of Evidence, defense counsel claimed that "it [was] a little hard to fashion an objection." Defense counsel then commented that "notwithstanding the fact that bullets were fired from the same gun . . . eighteen or nineteen hours apart, I don't see the relevance . . . [t]he description of the person . . . doesn't fit my client . . . [and] there was a claim that what happened to . . . Carter was a result [of] a dispute over a woman. So, I, you know . . . relevance, common scheme, whatever the claim may . . . I don't think it crosses the relevance threshold, number one. Number two . . . if it is able to crawl over the relevance threshold, barely, I see a tremendous prejudicial effect that far outweighs whatever minute probative value . . . is there. And that's a concern of mine. But I need specificity, and that's the whole point of me filing the motion for . . . notice of the uncharged misconduct . . . ."

Thereafter, by agreement of the parties, the court withheld its ruling on the admissibility of the proffered misconduct evidence to afford the state two more days to identify what exception to the Connecticut Code of Evidence on which it would rely in offering the evidence detailed in its offer of proof. Noting his agreement with the court's suggestion, defense counsel stated, "[my] preference . . . would be to wait [until] Friday, and the rationale is just because of the additional names that were disclosed, the cases that [the state] is relying on, it would afford me an opportunity to see what I can do about it. . . . Based on the information disclosed today, I may have something for the court, possibly by tomorrow. Obviously, I'd like to get it to the court in advance of Friday."

Two days later, in accordance with the court's instructions, the state filed an amended notice of intent to offer other crimes evidence. In that filing, the state expressly stated that the Carter evidence would be

offered as evidence of the defendant's intent and motive to conspire to participate and to aid the principal in shooting the victim in this case. The defendant did not file a motion in limine seeking the exclusion of such evidence.

On the second day of its case-in-chief, November 10, 2014, the state, outside the presence of the jury, reasserted its intention to introduce the drug evidence and the Carter evidence. Specifically, the state asserted that this evidence was relevant to the defendant's motive for being involved in shooting the victim, as well as to his control of the Bedford Street area. In addition, the state indicated its intention to offer evidence of a third instance of uncharged misconduct, which involved the defendant's separate alleged assault of a man named Nigel, because he had been selling drugs in the area controlled by MGB without the gang's permission.

In response to the state's amended notice of intent, defense counsel remarked: "I did have a chance to read [case law] over the weekend and I appreciate the opportunity to better get a handle on . . . the law surrounding the misconduct. I do understand the claim of relevancy by the state's attorney. However, I . . . do believe, in particular, with regard to the alleged bad act involving . . . Nigel, as well as the . . . involvement by my client in the [Carter] shooting, that . . . whatever probative value is achieved through the introduction of that evidence, it's far outweighed by the prejudicial impact. It's . . . overwhelming, in my opinion. . . . And although I do maintain my objection, and I'd ask the court to rule in my favor, I would ask the court, if the court intends to allow this testimony and this evidence in, to give the appropriate . . . limiting instructions throughout the introduction of this evidence as to what it's offered for and to the extent possible, obviously, to minimize the prejudicial aspects of . . . the evidence, in particular, the . . . [Carter] . . . evidence because it is . . . shocking and . . . my concern is . . . that the jury will take that evidence, disregard the actual evidence from this case and convict my client for his conduct or alleged conduct in that case."

The court subsequently ruled that it would allow limited uncharged misconduct evidence regarding the defendant's membership in MGB and its control of the drug trade in the Bedford Street area. The court further stated: "[A]s far as the shooting on Liberty Street is concerned, I have been weighing those factors for quite some time since I got this case, I guess, because there's so much material here provided through the grand jury investigation. And the fact that each of the charges in this information against [the defendant] are specific intent crimes, as opposed to general intent, makes the evidence, particularly the ballistics evidence, very rele-

vant, highly probative. And, properly sanitized, I'm going to allow in evidence on the Liberty Street shooting that occurred eighteen hours after the incident that we're trying. As far as exactly what we need to sanitize, I want to go through that with you gentlemen in some detail. Of course, the fact that someone was killed at that scene is out."[18] Last, the court excluded evidence of the alleged assault on Nigel on grounds of its prejudicial effect on the defendant and lack of notice.

Shortly thereafter, in the presence of the jury, the prosecutor asked Campos whether there was "a certain . . . group" that hung out on Bedford Street and if it was known by a particular name. The defendant objected and asked to be heard outside the presence of the jury. The defendant then requested clarification as to whether the court's decision to admit the drug evidence included a ruling that the name of the gang was also admissible. The court clarified that, on the basis of its earlier ruling, the name of the gang was admissible. The defendant raised no further objections to the admission of such evidence.

That afternoon, after the testimony of Campos and Doster, both of whom testified without further objection as to the drug evidence; see part II A of this opinion; the court, sua sponte, instructed the jury that "[w]hen the state offers evidence of . . . misconduct, it's not being admitted to prove the bad character, propensity or criminal tendencies of the defendant. It's being admitted solely to show intent and motive. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues of motive and intent, and each of those legal concepts you will get an instruction on.

"On the other hand, if you don't believe the evidence or even if you do, you find it's not logically, rationally and conclusively support on the issues of motive and intent, you may not consider that testimony for any other purpose. You may not consider evidence of other misconduct of the defendant for any purpose, other than the ones I just told you about because it could predispose you to critically believe the defendant may be guilty of the offenses charged here merely because of the other alleged misconduct. So, you may consider that evidence, if you credit it, only on the issues of intent and motive."

On the third day of trial, November 12, 2014, the state concluded its presentation of the evidence regarding the shooting of the victim. Thereafter, the court informed the jurors that the state was "going to shift gears in this case" and asked the jury to take a short

recess. Outside the presence of the jury, the court inquired as to the order of the state's witnesses and stressed that the state should take great care not to reveal that Carter had died on the night of the shooting. By agreement of the parties, the state informed the court that it would ask leading questions to its witnesses and instruct them that they were not to reveal that Carter had been killed, but only that he had been shot.

The court then summoned the jury back to the court-room, after which it stated that "[t]he reason I said we're switching gears, ladies and gentlemen, is, most of the evidence that's remaining in the state's case-in-chief, as far as I know, concerns a different incident, and I didn't want you to be confused. And the state will be offering this evidence, and I will be giving you a specific instruction about it. . . . [T]here will be some evidence in this case of other acts of misconduct. It's not being admitted to prove bad character, propensity of criminal tendencies of the defendant. It's being entered simply to show intent and motive related to the crimes that are being tried in this case, and you may not consider such evidence as establishing a predis-position on the part of the defendant to commit any of the crimes charged in our information, nor to demon-strate a criminal propensity.

"You may consider such evidence if you believe it and further find it logically, rationally and conclusively supports the issues for which it is being offered by the state. But it bears only on the issues of intent and motive concerning the charges that arise from the Bedford Street incident. And you may not consider evidence of other misconduct of the defendant for any purpose other than the ones I just told you because if you do, it may predispose your mind to . . . uncritically believe the defendant may be guilty of the offense here charged, merely because of other misconduct. For this reason, you consider it only on the issues of intent and motive."

Thereafter, in accordance with its offer of proof, the state presented, inter alia, the testimony of Creter, Kosi-nski, Weaver, Stephenson and Daniels, the substance of which has been set forth previously in this opinion. Only Young, of the witnesses mentioned in the state's offer of proof, did not testify. At the conclusion of the state's case-in-chief that afternoon, the court reins-tructed the jury that evidence regarding uncharged mis-conduct of the defendant was "admitted . . . only to establish . . . his intent, motive in the matter involving [the victim]. You may not consider such other evidence as establishing a predisposition on the part of the defen-dant to commit any crimes charged or to demonstrate a criminal propensity. . . . If you don't believe the evi-dence or even if you do, and you find that it does not logically, rationally, and conclusively support on the issues of motive, intent in the [present] matter . . .

then you may not consider it for any purpose."

With these additional facts in mind, we address each of the defendant's claims.

### A

### Drug Evidence

The defendant first claims that the court abused its discretion by admitting the drug evidence in this case because the fact that the defendant was a member of a drug selling gang was not relevant to his motive or intent to harm the victim or to conspire with or aid others to do so in this case, for which it was offered and admitted at trial. The state responds that this claim cannot be reviewed on appeal because the defendant failed to preserve the claim before the trial court. Rather, the state argues, the defendant objected only to the Carter evidence and to evidence of the separate assault of Nigel. In response, the defendant argues that he objected to the introduction of the drug evidence before and during trial, and thus that the claim was properly preserved for our consideration. We agree with the state.

"It is well established that generally this court will not review claims that were not properly preserved in the trial court. . . . Where a defendant fails to seek review of an unpreserved claim under either [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)] or the plain error doctrine [set forth in Practice Book § 60-5], this court will not examine such a claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Epps*, 105 Conn. App. 84, 92, 936 A.2d 701 (2007), cert. denied, 286 Conn. 903, 943 A.2d 1102 (2008). Here, the defendant did not object either to the relevance or the prejudicial effect of the drug evidence. Accordingly, we decline to reach the merits of that claim.

### B

### Carter Evidence

The defendant next claims that the court abused its discretion in admitting the Carter evidence because that evidence was not relevant either to his motive to commit or to any intent required for the commission of any charged offense. Alternatively, the defendant argues that, even if the Carter evidence was somehow relevant to his motive or intent, its probative value was outweighed by its prejudicial effect. In support of this claim, the defendant argues that the facts of the Carter shooting were so dissimilar from those of the present case that it had little, if any, bearing on the issue of the defendant's alleged motive or intent. The defendant further argues that the violent nature of the Carter shooting created an inherent risk that it would unduly arouse the jurors' emotions or that the jury would use it as evidence of the defendant's propensity to commit violent acts. On those grounds, the defendant claims

that the court abused its discretion in admitting the Carter evidence, and thus that he is entitled to a new trial.

The state disagrees, arguing that the defendant failed to preserve his claim that the Carter evidence was not relevant to the issues of motive or intent. Rather, the state argues, the defendant objected to the Carter evidence only on the ground that its probative value was outweighed by its prejudicial effect. The state thus argues that our review of the defendant's claim is confined to that narrow issue. The defendant responds that, by virtue of his remarks to the court on November 5, 2014, and his subsequent remarks on November 10, 2014, that he "maintained his objection" on the ground of relevance, and thus the issue of its relevance was properly preserved. We agree with the state.

As stated in part II A of this opinion, an appellate court is not bound to review a claim unless it was "distinctly raised at the trial or arose subsequent to the trial. . . ." Practice Book § 60-5; see also *State* v. *Rogers*, 199 Conn. 453, 460–61, 508 A.2d 11 (1986). Furthermore, it is well settled that "[o]ur review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the party's objection is based." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 679–80 n.6, 31 A.3d 1012 (2011). Here, the defendant's remarks on November 10, 2014, addressed only the issue of prejudice; the defendant did not specifically object to the Carter evidence on the ground of relevance. Although the defendant argues on appeal that, when he "[maintained his] objection" on November 10, 2014, he was referring to his November 5, 2014 remarks concerning relevance, such an argument is not supported by the record. Instead, a fair reading of the trial transcript indicates that the defendant's comment referred to his objection as to the prejudicial effect of the Carter evidence, which he had raised in the paragraph immediately preceding his statement that he "[maintained his] objection." We thus agree with the state that our scope of review is limited to whether the probative value of the Carter evidence was outweighed by its prejudicial effect.

We now address our standard of review and the legal principles applicable to the defendant's claim. "As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and

material." (Citations omitted; internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 675–76, 469 A.2d 760 (1983). "Such evidence may be admitted for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity." *State* v. *Brown*, 153 Conn. App. 507, 526, 101 A.3d 375 (2014), cert. granted on other grounds, 319 Conn. 901, 122 A.3d 636 (2015) (appeal withdrawn August 15, 2016). "When weighing the admissibility of relevant . . . misconduct evidence, a trial court is required to conduct a . . . balancing assessment of whether the evidence is more prejudicial than probative. This inquiry is required in order to militate against the risk that the attention of a jury may be distracted from consideration of the proof of the charges at hand, and, instead, and for improper reasons, fix the defendant's guilt on evidence of marginal evidentiary value. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion. . . .

"[U]ndue prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous. . . . [T]here are certain situations in which the potential prejudicial effect of relevant evidence would suggest its exclusion. They are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Citations omitted; internal quotation marks omitted.) Id., 530–31.

In the present case, the defendant argues that any probative value of the Carter evidence was outweighed by its prejudicial effect because (1) the state spent an undue amount of time on collateral issues; (2) the state's emphasis on such evidence likely confused the jury as to the issues in this case; (3) the jury likely used the Carter shooting as evidence demonstrating the defendant's propensity to engage in violent behavior, in violation of § 4-5 (a) of the 2009 edition of the Connecticut Code of Evidence;[19] and (4) the violent nature of the Carter shooting unduly appealed to the emotions of the jury.

The state counters that the probative value of the Carter evidence was not outweighed by its prejudicial effect. In support of its position, the state argues that such evidence was highly probative of the defendant's motive and intent to commit the crimes of conspiracy to commit and accessory to assault in the first degree

because (1) the Carter shooting involved a conspiracy between some of the same actors who were involved in shooting the victim in this case, particularly, the defendant and Jerk; (2) it was committed with the same firearm that was used to shoot the victim in this case eighteen hours earlier; (3) it was set up and carried out in a manner that demonstrated the defendant's position of authority within MGB and his ability to order other members of MGB to shoot rival drug dealers, as allegedly happened in this case; and (4) it showed that the defendant's motives for the two shootings were identical: to prevent rival drug dealers from selling drugs without permission on MGB's turf. The state further argues that, consistent with the defendant's request, the court took adequate steps to minimize the prejudicial nature of the Carter evidence because the state was prohibited from eliciting testimony that Carter had been killed as a result of the shooting. So sanitized, it claims, the Carter evidence involved conduct no more shocking or brutal than that which the defendant is claimed to have engaged in when committing the charges at issue in this case. Last, the state argues that the court instructed the jury prior to, during, and after the presentation of the Carter evidence that it could use that evidence only for its consideration of the defendant's motive and intent in the present case.

After a thorough review of the record, we conclude that the court did not abuse its discretion in determining that the probative value of the Carter evidence outweighed its prejudicial effect. First, we note that the defendant admitted during the November 5, 2014 hearing that he had received the evidence concerning the Carter shooting several months prior to trial. The defendant thus had reasonable grounds to anticipate the evidence and was not unfairly surprised by the state's offer of such evidence. Second, we note that the state's presentation of such evidence was limited to the latter portion of the third and final day of evidence, and thus we cannot conclude that the introduction of such evidence caused the parties to spend an undue amount of time on these issues. See C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 4.9.2, p. 144. ("Whether delay is undue or time wasted is obviously a very subjective criterion. . . . In the end, this is a judgment call for the trial judge."). Third, we disagree that the admission of such evidence unduly distracted the jury from the issues in this case. The court's admission of the Carter evidence was premised on the state's offer that it would limit its inquiries to the defendant's self-proclaimed solicitation, participation and oversight of the shooting by Jock; his inculpatory statements that he had ordered the shooting because he believed Carter was selling drugs in MGB territory; and the fact that the same firearm was used on two separate targets within a span of eighteen hours. These facts went directly to a contested issue in the present case, namely,

whether the defendant intentionally entered into an agreement to commit and intentionally aided the principal in the commission of assault in the first degree.

Last, although the defendant raises a colorable argument that the Carter evidence unduly aroused the emotions of the jury, we conclude that the court took adequate measures to minimize the emotional impact of such evidence. Our conclusion rests on the fact that the court excluded any evidence that the victim in this case died before trial;[20] excluded any evidence that Carter had been killed as a result of the shooting on Liberty Street; and repeatedly instructed the jury that its consideration of the Carter evidence was limited to the issue of the defendant's intent and motive to commit the crimes charged against him in this case, and thus could not be used to infer that the defendant had a predisposition to engage in criminal behavior. See, e.g., *Wiseman* v. *Armstrong*, 295 Conn. 94, 113, 989 A.2d 1027 (2010) ("it is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them" [internal quotation marks omitted]). Accordingly, we conclude that the court did not abuse its discretion in admitting the Carter evidence in this case.

### III

### BATSON CHALLENGE

The defendant's final claim on appeal is that his constitutional rights were violated when the state used a peremptory challenge to strike a minority juror without providing a sufficient race neutral explanation, in violation of the doctrine of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We conclude that the record is inadequate to reach the merits of the defendant's claim.

Jury selection occurred over the course of two days, October 30 and 31, 2014. On the first day of jury selection, the parties conducted voir dire of a prospective juror, R.E.[21] Prior to defense counsel's questioning of R.E., the court inquired as to whether R.E. would suffer any financial hardship by participating in jury duty. In response, R.E. initially informed the court that, although he worked part-time, his shift began at 4:30 p.m. and that his job was within walking distance of the courthouse. The court then asked R.E. to contact his employer to determine whether he would be compensated for any work he missed or, alternatively, whether he would be able to begin his shift after 5 p.m. After speaking with his employer, R.E. stated that if he were selected to serve, he would be able to start his shifts after the court had adjourned for the day, and thus he had no financial concerns about being selected as a juror.

Thereafter, defense counsel questioned R.E. as to whether he could keep an open mind, determine which

witnesses were credible, follow the court's instructions on the law, and engage in a free exchange of ideas with his fellow jurors during deliberations. R.E. answered in the affirmative to each of these questions. Thereafter, the following colloquy occurred during the prosecutor's voir dire of R.E.:

"[The Prosecutor]: . . . You're from Hartford?

"[R.E.]: Yes.

"[The Prosecutor]: You haven't heard anything about this incident—

"[R.E.]: No, sir.

"[The Prosecutor]: —which was presented to you? None of the names that were listed to you sounded familiar—

"[R.E.]: No, sir.

"[The Prosecutor]: —anything like that? So, you're at Easter Seals. You've been there for how long? You said about four years?

"[R.E.]: Four years.

\*\*\*

"[The Prosecutor]: Have you ever had anyone close to you, friends, family members, anyone like that, that has been the victim of a crime?

"[R.E.]: No, sir.

"[The Prosecutor]: And if you were to hear information about drugs within this trial, do you think you could still consider that information and make your decisions or would you be turned off by that?

"[R.E.]: I could still make my decision.

"[The Prosecutor]: Okay. Still be open-minded and consider all the information—

"[R.E.]: Yes.

"[The Prosecutor]: —presented?

"[R.E.]: Yes, sir.

"[The Prosecutor]: Is there anything either of us have left out that you think would—would be important to tell us about your ability to sit here as a juror?

"[R.E.]: No, sir.

"[The Prosecutor]: Great. Thanks for your time."

Thereafter, R.E. exited the courtroom and the following colloquy occurred:

"[Defense Counsel]: Accepted.

"[The Prosecutor]: Excused.

"[Defense Counsel]: Your Honor, I would ask for a gender or a race neutral explanation or basis.

"[The Prosecutor]: Should I give one?

"[The Court]: Yes.

"[The Prosecutor]: It would be his employment history, Your Honor, and just basically his sense of security. I do have concerns also that he's from Hartford, although he did indicate that he knew nothing about the offense.

"[Defense Counsel]: Your Honor, if I may. We have two Caucasian women on the panel at this point in time. He answered all the questions, in my view at least, and I think counsel would agree, honestly. He didn't express any reservations about security. Being from Hartford is not a bar to be in this case. He did not express any familiarity with the case. I think he answered all the questions right. I think he's got a right to serve on this panel.

"[The Prosecutor]: I think I presented a race neutral reason, Your Honor. It's my prerogative. I don't believe—or I've indicated to the court that I am not excusing him based on his race.

"[The Court]: His work history?

"[The Prosecutor]: Yes.

"[The Court]: All right. He's excused."

R.E. was then summoned to the courtroom and informed that he had been excused. After R.E. had been dismissed, the court, sua sponte, stated: "I would note that [R.E.] is not the same race as the defendant, African-American."

Later that afternoon, the court asked defense counsel whether he wanted to offer any rebuttal to the state's race neutral explanation for using its peremptory challenge to strike R.E. In response, defense counsel stated: "Well, I mean the idea that his employment, because he was freelancing, and the idea that he was still working, these are tough times, there was nothing extraordinary about being a freelancer. I meant that the record speaks for itself. I didn't hear anything extraordinary, like, he'd been a victim of a crime or had a brother incarcerated or had been harassed by the police or all the things that you typically hear from . . . individuals who . . . live in the city. His answers were . . . for lack of a better word, you know, correct, either posed by me or by counsel. So, no, I guess . . . I don't really have a rebuttal because I think the record . . . that's . . . kind of the point, the record speaks for itself."

On appeal, the defendant argues that his constitutional rights were violated because the state's race neutral explanation for striking R.E. was merely pretextual and that the state's willingness to accept two other venirepersons, I.L. and G.H.—both of whom the defendant claims were nonminority venirepersons who also held part-time jobs—demonstrates that the state's

peremptory challenge as to R.E. was racially motivated. The state argues that the defendant is not entitled to review of this unpreserved claim due to the inadequacy of the record. The defendant responds that he adequately preserved this claim and, alternatively, seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40 see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third condition).

On the basis of the record presented, we conclude that the defendant did not preserve his claim of disparate treatment before the trial court; *State* v. *Young*, 76 Conn. App. 392, 399, 819 A.2d 884 ("because a claim of purposeful discrimination under *Batson* raises issues of fact to be decided by the trial court, the moving party's failure to inform the trial court of the full factual basis for the claim renders that claim unreviewable" [internal quotation marks omitted]), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003); nor did he satisfy the reviewability requirements of *Golding* because the transcripts of the voir dire do not indicate the racial composition of the empaneled jury. See *State* v. *Owens*, 63 Conn. App. 245, 263, 775 A.2d 325 ("The defendant must satisfy the reviewability requirements of *Golding* before we consider his unpreserved claim. He did not object to the state's exercise of any peremptory challenge during voir dire, and the transcripts of the voir dire do not indicate the race of any venireperson. The absence of a record bars our review of this claim."), cert. denied, 256 Conn. 933, 776 A.2d 1151 (2001).

Further, the record belies the defendant's assertion that there are adequate facts of record to demonstrate that the state engaged in racially disparate treatment by accepting both I.L. and G.H., whom the defendant claims were nonminority venirepersons with work restrictions similar to R.E.'s. First, although the court expressly noted that R.E. was *not* of the same race as *the defendant*, there is nothing in the record demonstrating R.E.'s personal race or ethnicity. *State* v. *Lane*, 101 Conn. App. 540, 548–49, 922 A.2d 1107 ("The record does not reflect [the venireperson's] race. We conclude that we cannot review any *Batson* claim . . . that the defendant may have had regarding the state's use of its peremptory challenge . . . because of a lack of a sufficient record." [Footnote omitted.]), cert. denied, 283 Conn. 910, 928 A.2d 538 (2007). Second, the state correctly recognizes a similar lack of facts regarding I.L.'s race. Without such information, we cannot engage in an analysis of disparate treatment between I.L. and R.E. Finally, and contrary to the defendant's assertion, the court expressly noted that G.H., the remaining venireperson cited in the defendant's brief, was an African-American female. Thus, the prosecution's acceptance of G.H. but not R.E. could not serve as evidence of the state's discriminatory use of peremptory challenges to exclude similarly situated minority persons from the defendant's jury. Absent such necessary facts of record,

we decline to reach the merits of the defendant's claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[5] Throughout the course of the trial, the witness was referred to as Sonesta Reynolds, Sonesta Campos, and Sonesta Reynolds-Campos. Because the witness indicated no preference as to how she was addressed, we refer to her simply as Campos.

[6] Prior to trial, the victim died due to an unrelated drug overdose. Following the victim's death, police were able to remove and analyze the bullet that had struck the victim's spinal cord. See part II B of this opinion. As part of its evidentiary rulings, the court excluded any reference to the victim's death.

[7] The jury did not, at any time during the defendant's criminal trial, receive evidence concerning or related to the state investigating grand jury.

[8] "We address the defendant's sufficiency of the evidence claim before we address any other claims because if a defendant prevails on such a claim, the proper remedy is to direct a judgment of acquittal." *State* v. *Holley*, 160 Conn. App. 578, 584 n.3, 127 A.3d 221, cert. granted on other grounds, 127 A.3d 1000 (2015); see also *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 564 (2007).

[9] On appeal, the defendant asserts that the court abused its discretion in admitting evidence of uncharged misconduct. In reviewing a sufficiency of the evidence claim, however, we look at "no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Chemlen*, 165 Conn. App. 791, 816–18, 140 A.3d 347, cert. denied, 322 Conn. 908, 140 A.3d 977 (2016). Thus, although we address the defendant's evidentiary claims in part II of this opinion, our review of the defendant's sufficiency claim necessarily includes our consideration of the uncharged misconduct evidence admitted at trial and the inferences the jury reasonably could have drawn therefrom.

[10] Daniels testified that he was allowed to sell drugs in the neighborhood because he had lived in the area of Bedford Street for approximately eleven years, he "was cool with some of the friends of the defendant," and there was an understanding that "[i]f [he] was the hustler on that block, [he] had to be buying [MGB's] drugs."

[11] On appeal, the defendant asserts that the court abused its discretion in admitting this evidence of uncharged misconduct. See footnote 9 of this opinion. We address those arguments in part II of this opinion.

[12] Although Carter died as a result of his wounds, the court excluded from the trial any reference to Carter's death, and the state was prohibited from referring to the shooting as a murder or homicide.

[13] AFIS stands for automated fingerprint identification system.

[14] On direct examination, Weaver testified that between 2004 and 2014, he had received extensive forensics training in "[analyzing] cellular phones, cellular mapping . . . [and] computer forensics." The defendant did not object either to Weaver's credentials or the substance of his testimony.

[15] In his brief to this court, the defendant maintains that Doster testified that his conversation with the defendant occurred hours, not minutes, before the shooting occurred. The transcripts demonstrate, however, that Doster expressly stated that his conversation with the defendant occurred "[m]aybe a couple minutes before . . . the incident happened." Although Doster equivocated on this time line during cross-examination, it is the sole province of the trier of fact to resolve those discrepancies and give weight to whatever testimony it believes to be credible. *State* v. *Allen*, supra, 289 Conn. 559.

[16] We note that the defendant does not argue on appeal that there was

insufficient evidence that any member of the conspiracy, if established, engaged in an overt act in furtherance of the conspiracy. Rather, the defendant's claim is limited to whether the jury was presented with sufficient evidence to sustain its findings that he intentionally entered into an agreement to conspire to and/or intended that a member of the conspiracy commit assault in the first degree by means of the discharge of a firearm. In light of the fact that the victim was, in fact, physically injured by means of the discharge of a firearm, our inquiry is limited to the first two elements of the charge of conspiracy.

[17] See footnote 6 of this opinion.

[18] See footnote 12 of this opinion.

[19] Pursuant to § 4-5 (a) of the 2009 edition of the Connecticut Code of Evidence: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person."

[20] See footnote 6 of this opinion.

[21] "References to individual jurors will be made by use of initials so as to protect their legitimate privacy interests." *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).