******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* JAMES RAYNOR
## (SC 20042)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of assault in the first degree as
an accessory and conspiracy to commit assault in the first degree, the
defendant, an African-American, appealed to the Appellate Court, claim-
ing that the prosecutor engaged in racially disparate treatment during
jury selection, in violation of *Batson* v. *Kentucky* (476 U.S. 79), by
excusing a prospective juror, R, on the basis of his employment history,
even though the prosecutor accepted two other venirepersons, I and G,
whom the defendant claimed were nonminority venirepersons with work
restrictions similar to those of R. The Appellate Court affirmed the
judgment of the trial court and concluded that the record was inadequate
to review the defendant's unpreserved *Batson* claim because, inter alia,
the transcripts of the voir dire did not indicate the racial composition
of the empaneled jury. The Appellate Court also found that, although
the trial court had, sua sponte, remarked that R was not the same race
as the defendant, there was nothing in the record to indicate the race
or ethnicity of either R or I, and, without that information, the court
could not engage in a disparate treatment analysis under *Batson*. On
the granting of certification, the defendant appealed to this court. *Held*
that the defendant could not prevail on his claim that the Appellate
Court incorrectly concluded that the failure of the record to indicate
the racial composition of the empaneled jury rendered it inadequate to
review his *Batson* claim: this court adopted the Appellate Court's well
reasoned opinion as a proper statement of the certified issue and the
applicable law concerning that issue and, accordingly, affirmed the
Appellate Court's judgment; moreover, this court agreed with the state's
alternative ground for affirmance that the trial court's finding that the
prosecutor did not commit purposeful discrimination in exercising a
peremptory challenge to strike R was not clearly erroneous; furthermore,
with respect to the defendant's request that this court exercise its super-
visory authority over the administration of justice to require that pro-
spective jurors identify their race prior to jury selection, this court
anticipated that such a proposal would be addressed by the Jury Selec-
tion Task Force that the Chief Justice will appoint, pursuant to this
court's decision in the companion case of *State* v. *Holmes* (334 Conn.
), to suggest changes to court rules, policies, and legislation necessary
to ensure that Connecticut juries are representative of the state's
diverse population.

Argued January 16—officially released December 24, 2019

*Procedural History*

Substitute information charging the defendant with
the crimes of assault in the first degree as an accessory
and conspiracy to commit assault in the first degree,
brought to the Superior Court in the judicial district of
Hartford and tried to the jury before *Mullarkey, J.*;
verdict and judgment of guilty, from which the defen-
dant appealed to the Appellate Court, *DiPentima,
C. J.*, and *Sheldon* and *Flynn, Js.*, which affirmed the
trial court's judgment, and the defendant, on the grant-
ing of certification, appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the
appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with

whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PER CURIAM. The defendant, James Raynor, appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming his conviction, rendered after a jury trial, of assault in the first degree as an accessory in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8, and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-48. *State* v. *Raynor*, 175 Conn. App. 409, 412–13, 167 A.3d 1076 (2017). On appeal, the defendant claims that the Appellate Court incorrectly concluded that that the record was inadequate to review his challenge under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the prosecutor's exercise of a peremptory challenge on prospective juror R.E.[2] on the basis of his employment history, even though the record does not indicate the race or ethnicity of both R.E. and one of the two jurors, I.L. and G.H., whom the defendant highlighted as examples of disparate treatment by the prosecutor. In response, the state disagrees and also proffers, as an alternative ground for affirmance, that the trial court did not commit clear error in finding that the prosecutor did not engage in purposeful discrimination when he peremptorily challenged R.E. We affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following relevant facts and procedural history. "Jury selection occurred over the course of two days, October 30 and 31, 2014. On the first day of jury selection, the parties conducted voir dire of a prospective juror, R.E. Prior to defense counsel's questioning of R.E., the court inquired as to whether R.E. would suffer any financial hardship by participating in jury duty. In response, R.E. initially informed the court that, although he worked part-time, his shift began at 4:30 p.m. and . . . his job was within walking distance of the courthouse. The court then asked R.E. to contact his employer to determine whether he would be compensated for any work he missed or, alternatively, whether he would be able to begin his shift after 5 p.m. After speaking with his employer, R.E. stated that, if he were selected to serve, he would be able to start his shifts after the court had adjourned for the day, and thus he had no financial concerns about being selected as a juror.

"Thereafter, defense counsel questioned R.E. as to whether he could keep an open mind, determine which witnesses were credible, follow the court's instructions on the law, and engage in a free exchange of ideas with his fellow jurors during deliberations. R.E. answered in the affirmative to each of these questions. Thereafter, the following colloquy occurred during the prosecutor's voir dire of R.E.:

" '[The Prosecutor]: . . . You're from Hartford?

" '[R.E.]: Yes.

" '[The Prosecutor]: You haven't heard anything about this incident—

" '[R.E.]: No, sir.

" '[The Prosecutor]: —which was presented to you? None of the names that were listed to you sounded familiar—

" '[R.E.]: No, sir.

" '[The Prosecutor]: —anything like that? So, you're [employed] at Easter Seals. You've been there for how long? You said about four years?

" '[R.E.]: Four years.

\* \* \*

" '[The Prosecutor]: Have you ever had anyone close to you, friends, family members, anyone like that, that has been the victim of a crime?

" '[R.E.]: No, sir.

" '[The Prosecutor]: And if you were to hear information about drugs within this trial, do you think you could still consider that information and make your decisions or would you be turned off by that?

" '[R.E.]: I could still make my decision.

" '[The Prosecutor]: Okay. Still be open-minded and consider all the information—

" '[R.E.]: Yes.

" '[The Prosecutor]: —presented?

" '[R.E.]: Yes, sir.

" '[The Prosecutor]: Is there anything either of us have left out that you think would—would be important to tell us about your ability to sit here as a juror?

" '[R.E.]: No, sir.

" '[The Prosecutor]: Great. Thanks for your time.'

"Thereafter, R.E. exited the courtroom, and the following colloquy occurred:

" '[Defense Counsel]: Accepted.

" '[The Prosecutor]: Excused.

" '[Defense Counsel]: Your Honor, I would ask for a gender or a race neutral explanation or basis.

" '[The Prosecutor]: Should I give one?

" '[The Court]: Yes.

" '[The Prosecutor]: It would be his employment history, Your Honor, and just basically his sense of security. I do have concerns also that he's from Hartford, although he did indicate that he knew nothing about the offense.

" '[Defense Counsel]: Your Honor, if I may. We have two Caucasian women on the panel at this point in time. He answered all the questions, in my view at least, and I think counsel would agree, honestly. He didn't express any reservations about security. Being from Hartford is not a bar to be in this case. He did not express any familiarity with the case. I think he answered all the questions right. I think he's got a right to serve on this panel.

" '[The Prosecutor]: I think I presented a race neutral reason, Your Honor. It's my prerogative. I don't believe—or I've indicated to the court that I am not excusing him based on his race.

" '[The Court]: His work history?

" '[The Prosecutor]: Yes.

" '[The Court]: All right. He's excused.'

"R.E. was then summoned to the courtroom and informed that he had been excused. After R.E. had been dismissed, the court, sua sponte, stated: 'I would note that [R.E.] is not the same race as the defendant, African-American.'

"Later that afternoon, the court asked defense counsel whether he wanted to offer any rebuttal to the [prosecutor's] race neutral explanation for using its peremptory challenge to strike R.E. In response, defense counsel stated: 'Well, I mean the idea that his employment, because he was freelancing, and the idea that he was still working, these are tough times, there was nothing extraordinary about being a freelancer. I meant that the record speaks for itself. I didn't hear anything extraordinary, like, he'd been a victim of a crime or had a brother incarcerated or had been harassed by the police or all the things that you typically hear from . . . individuals who . . . live in the city. His answers were . . . for lack of a better word, you know, correct, either posed by me or by counsel. So, no, I guess . . . I don't really have a rebuttal because I think the record . . . that's . . . kind of the point, the record speaks for itself.' " (Footnote omitted.) *State* v. *Raynor*, supra, 175 Conn. App. 454–58.

On appeal, the Appellate Court rejected the defendant's claim that the prosecutor had violated *Batson* in exercising a peremptory challenge on R.E. because his race neutral explanation was a pretext for discrimination. Id., 458–59. The Appellate Court further disagreed with the defendant's argument that the "[prosecutor's] willingness to accept two other venirepersons, I.L. and G.H.—both of whom the defendant claims were nonminority venirepersons who also held part-time jobs—demonstrates that the [prosecutor's] peremptory challenge as to R.E. was racially motivated." Id., 458. The Appellate Court concluded that this claim of disparate treatment was unpreserved and unreviewable

under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because "the transcripts of the voir dire do not indicate the racial composition of the empaneled jury" or support the "defendant's assertion that there are adequate facts of record to demonstrate that the [prosecutor] engaged in racially disparate treatment by accepting both I.L. and G.H., whom the defendant claims were nonminority venirepersons with work restrictions similar to R.E.'s. First, although the court expressly noted that R.E. was *not* of the same race as *the defendant*, there is nothing in the record demonstrating R.E.'s personal race or ethnicity. . . . Second, the state correctly recognizes a similar lack of facts regarding I.L.'s race. Without such information, [the court] cannot engage in an analysis of disparate treatment between I.L. and R.E." (Citation omitted; emphasis in original.) *State* v. *Raynor*, supra, 175 Conn. App. 458–59; see id., 459 ("[a]bsent such necessary facts of record, we decline to reach the merits of the defendant's claim"). Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 459. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the Appellate Court incorrectly concluded that the failure of the record to indicate the racial composition of the empaneled jury rendered it inadequate to review his *Batson* claim, to the extent that it was founded on the prosecutor's disparate treatment of R.E. relative to I.L. and G.H. We disagree. To the contrary, we believe that the Appellate Court's well reasoned opinion fully addresses and properly resolves the certified issue. It would serve no purpose for us to repeat the discussion contained therein. We therefore adopt the Appellate Court's opinion as the proper statement of the issue and the applicable law concerning that issue. See, e.g., *Griswold* v. *Camputaro*, 331 Conn. 701, 711, 207 A.3d 512 (2019); *Brenmor Properties, LLC* v. *Planning & Zoning Commission*, 326 Conn. 55, 62, 161 A.3d 545 (2017).

Beyond affirming the judgment of the Appellate Court, we offer three additional observations. First, although we have expressed concerns about the existing *Batson* inquiry, it remains controlling at this time, and we agree with the state's proffered alternative ground for affirmance that the trial court did not commit clear error in finding, under the third step of *Batson*, that the prosecutor did not commit purposeful discrimination in peremptorily challenging R.E. See, e.g., *State* v. *Edwards*, 314 Conn. 465, 493–97, 102 A.3d 52 (2014); see also *State* v. *Holmes*, 334 Conn.     ,     ,     A.3d     (2019) (discussing, inter alia, *Batson*'s failure to address implicit bias and enforceability issues created by purposeful discrimination requirement).

Second, with respect to the trial court's sua sponte observation that the defendant and R.E. are not the same race; see *State* v. *Raynor*, supra, 175 Conn. App.

457; we emphasize that this fact does not affect the defendant's right to seek relief under *Batson* because, in "*Powers* v. *Ohio*, 499 U.S. 400, 415, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), the United States Supreme Court extended the *Batson* principle to prohibit the use of racially motivated peremptory challenges irrespective of the race of the defendant."[3] *State* v. *Hodge*, 248 Conn. 207, 252–53, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); see, e.g., *State* v. *Rigual*, 256 Conn. 1, 8, 771 A.2d 939 (2001) (Hispanic defendant had standing to raise *Batson* claim to challenge exclusion of Portuguese venireperson).

Finally, the defendant seeks to have this court "exercise its supervisory authority to require that prospective jurors identify their race" prior to the jury selection process. The defendant argues that the optional disclosure of race presently required on the juror questionnaires promulgated pursuant to General Statutes § 51-232 (c)[4] renders it "impossible" to meet an apparent precondition to review of a *Batson* claim that the record reveal the "racial composition of the venire and empaneled jury . . . ." As counsel suggested in colloquy at oral argument before this court, in the absence of voluntary disclosure by the prospective juror, improving the record of the racial composition of the venire or empaneled jury might well better facilitate the resolution of *Batson* claims, many of which are supported by a comparative analysis that goes beyond the voir dire of the challenged juror. See, e.g., *State* v. *Edwards*, supra, 314 Conn. 496. The extent to which such disclosure should be *required*, however, raises significant administrative and public policy questions in an area in which our legislature has acted by enacting § 51-232 (c), particularly given the potentially difficult intersection of a juror's racial self-identification with the striking attorney's perception of that juror.[5] See E. Margolis, Note, "Color as a *Batson* Class in California," 106 Calif. L. Rev. 2067, 2088 (2018) ("[Arguing that] [r]ecognition of color as a distinct cognizable class may aid in establishing an operational alternative to race" because "[r]acial complexity challenges the basic *Batson* framework" insofar as "[n]o [bright line] rule exists to guide trial courts as to how to categorize mixed-race prospective jurors for *Batson* purposes: if a person's physical appearance and self-identified race or ethnicity do not match attorneys' or the trial judge's assumptions, whose definition controls? If a prospective juror identifies as belonging to multiple racial groups, in which of those groups may they be placed for making *Batson* motions and rulings?"). These exchanges at oral argument are part of the ongoing, robust discussions about the efficacy of *Batson* in addressing discrimination during the jury selection process, particularly when accounting for unconscious or implicit bias. We thank counsel for their thoughtful contributions to these discussions, which we expect will inform the work of the Jury Selection

Task Force that the Chief Justice will appoint pursuant to our decision in *State* v. *Holmes*, supra, 334 Conn.    , to suggest those changes to court rules, policies, and legislation necessary to ensure that our state court juries are representative of Connecticut's diverse population.

The judgment of the Appellate Court is affirmed.

[1] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the record's failure to indicate the racial composition of the venire or the empaneled jury rendered the record inadequate for review of the defendant's claim under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)?" *State* v. *Raynor*, 327 Conn. 969, 173 A.3d 952 (2017).

We note that the state asks us to rephrase the certified question because it does not accurately reflect the holding of the Appellate Court, the analysis of which focused only on the jurors that had been empaneled and did not discuss the venire as a whole. See *State* v. *Raynor*, 175 Conn. App. 409, 458–59, 167 A.3d 1076 (2017). "After hearing the parties and considering the case more fully, we conclude that the certified question [must be rephrased as it] does not properly frame the issues presented in the appeal because it inaccurately reflects the holding of the Appellate Court." *In re Jacob W.*, 330 Conn. 744, 747 n.1, 200 A.3d 1091 (2019); see *Stamford Hospital* v. *Vega*, 236 Conn. 646, 656, 674 A.2d 821 (1996). Accordingly, we rephrase the certified question to eliminate the reference to the venire.

[2] "In accordance with our usual practice, we identify jurors by initial in order to protect their privacy interests." *State* v. *Berrios*, 320 Conn. 265, 268 n.3, 129 A.3d 696 (2016).

[3] Nevertheless, the overall racial composition of the empaneled jury is one of several nondispositive factors that the court may consider under the third step of *Batson*, namely, determining whether the race neutral explanation proffered by the attorney exercising the peremptory challenge under the second step of *Batson* was a pretext for purposeful discrimination. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 260, 726 A.2d 531 (The court rejected the defendant's claim of pretext because, "at the time of each *Batson* challenge, the state already had accepted minority venirepersons; the final jury of twelve regular and three alternate jurors included four African-Americans and two Hispanics. . . . [T]he trial court, in assessing the validity of the state's proffered reasons, is entitled to take into account the extent to which the state has accepted minority venirepersons."), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *State* v. *Smith*, 222 Conn. 1, 13, 608 A.2d 63 (noting that "the panel ultimately chosen contained three black jurors and one black alternate" and stating that, "[a]lthough the racial composition of the jury impaneled is certainly not dispositive of the issue, since the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated . . . it is a factor that we must consider in assessing the prosecutor's explanation" [citation omitted; internal quotation marks omitted]), cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); see also *State* v. *Edwards*, supra, 314 Conn. 496 (The court concluded that there was no evidence of discrimination or disparate treatment in the prosecutor's use of peremptory challenges and observed that "[t]here were twenty-three venirepersons, six of whom were selected to serve on the jury and two of whom were selected as alternate jurors. It is unclear how many of the selected jurors were racial minorities, but the record reveals that at least one was African-American. There also is no evidence that other, nonminority jurors answered the juror questionnaire in an unusual way or were treated differently.").

[4] General Statutes § 51-232 (c) provides: "The Jury Administrator shall send to a prospective juror a juror confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished if the prospective juror finds it objectionable to do so. Such juror confirmation form and confidential juror questionnaire shall be signed by the prospective juror under penalty

of false statement. Copies of the completed questionnaires shall be provided to the judge and counsel for use during voir dire or in preparation therefor. Counsel shall be required to return such copies to the clerk of the court upon completion of the voir dire. Except for disclosure made during voir dire or unless the court orders otherwise, information inserted by jurors shall be held in confidence by the court, the parties, counsel and their authorized agents. Such completed questionnaires shall not constitute a public record.''

[5] We note that the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq., which governs jury selection in the federal court system, requires that juror questionnaires elicit information about a prospective juror's race, but— similar to § 51-232 (c)—also provides that such questionnaires must advise the prospective juror that "the furnishing of any information with respect to his religion, national origin, or economic status is not a prerequisite to his qualification for jury service, that such information need not be furnished if the person finds it objectionable to do so, and that information concerning race is required solely to enforce nondiscrimination in jury selection and has no bearing on an individual's qualification for jury service.'' 28 U.S.C. § 1869 (h) (2012). One federal District Court has suggested maximizing responses to the race inquiry on the questionnaire by moving the advisory about its use in preventing nondiscrimination to a more prominent location. See *United States* v. *Hernandez-Estrada*, Docket No. 10CR0558 BTM, 2011 WL 1119063, *10 (S.D. Cal. March 25, 2011) ("[m]oving the instructions to the front of the form would potentially increase the response rate because people might be more willing to provide information regarding race/ethnicity if it is made clear that such information is required for beneficial purposes, not to invade privacy or collect meaningless data''), aff'd, 704 F.3d 1015 (9th Cir. 2012), aff'd en banc, 749 F.3d 1154 (9th Cir. 2014), cert. denied, U.S.     , 135 S. Ct. 709, 190 L. Ed. 2d 445 (2014).