******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RAIKES
# Y. DELACRUZ-GOMEZ
## (SC 20828)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

### *Syllabus*

The defendant appealed, on the granting of certification, from the judgment of the Appellate Court, which affirmed the judgment of conviction of assault of public safety personnel and interfering with an officer. The defendant claimed that the Appellate Court incorrectly determined that the trial court had not abused its discretion when it allowed testimony naming the felony charges in the warrant for the defendant's arrest and identifying the task force that executed that warrant as the "Violent Fugitive Task Force." *Held*:

The trial court did not abuse its discretion when it admitted the names of the felony charges listed in the arrest warrant as evidence of uncharged misconduct, as the probative value of the evidence was strong and the trial court undertook sufficient measures to mitigate any potentially undue prejudice.

Although the testimony concerning the name of the task force should not have been admitted because it had no probative value and was unfairly prejudicial, the defendant failed to satisfy his burden of demonstrating that the error was harmful.

Argued March 27—officially released July 25, 2024*

### *Procedural History*

Substitute information charging the defendant with the crimes of assault of public safety personnel and interfering with an officer, brought to the Superior Court in the judicial district of Waterbury, where the court, *Klatt, J.*, overruled the defendant's objection to the admission of certain evidence and denied the defense's motion to exclude certain evidence; thereafter, the case was tried to the jury before *Klatt, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Bright, C. J.*, and *Moll* and *Vertefeuille, Js.*, which affirmed the judgment of the trial

---

* July 25, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Jennifer B. Smith*, assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don E. Therkildsen, Jr.*, supervisory assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. In this appeal, we address two claims that the trial court improperly admitted unduly prejudicial evidence. The defendant, Raikes Y. Delacruz-Gomez, was convicted, following a jury trial, of assault of public safety personnel in violation of General Statutes (Supp. 2016) § 53a-167c (a) (1),[1] and interfering with an officer in violation of General Statutes (Rev. to 2015) § 53a-167a (a),[2] after injuring a police officer assigned to a joint federal and state task force that was executing a warrant for his arrest. We granted certification to appeal from the judgment of the Appellate Court, which affirmed the trial court's judgment of conviction.[3] The defendant contends that the Appellate Court incorrectly held that the trial court had not abused its discretion by admitting testimony naming the

[1] Hereinafter, all references to § 53a-167c are to the version of that statute in the 2016 supplement of the statute.

[2] Hereinafter, all references to § 53a-167a are to the 2015 revision of the statute.

[3] We granted certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court had not erred in admitting uncharged misconduct evidence about the names of outstanding felony charges from an unrelated case in the defendant's arrest warrant?" And (2) "[d]id the Appellate Court correctly conclude that the admission of evidence that the Violent Fugitive Task Force arrested the defendant was not unfairly prejudicial?" *State* v. *Delacruz-Gomez*, 346 Conn. 925, 925, 295 A.3d 419 (2023).

felony charges in the defendant's outstanding warrant (warrant charges) and identifying the task force that executed that warrant as the "Violent Fugitive Task Force." We conclude that the trial court did not abuse its discretion by admitting the evidence pertaining to the warrant charges. We further conclude that, although the evidence pertaining to the name of the task force should not have been admitted, that evidence did not substantially sway the jury's verdict. Accordingly, we affirm the judgment of the Appellate Court.

The jury reasonably could have found the following facts. On November 18, 2016, members of a multiagency law enforcement task force went to the defendant's residence in Waterbury to serve two arrest warrants, one for the defendant and one for his son, Hendimbert Delacruz. The defendant's arrest warrant included charges of assault in the first degree and criminal possession of a firearm. The personnel assigned to execute the warrants included the following: United States Marshal James Masterson; Waterbury Police Department Detectives Daniel Chalker, Edward Mills, and Jeffrey Taylor; Connecticut Probation Officer Timothy McMahon; and three Connecticut parole officers.[4] Before going to the residence, the task force held a briefing, during which the officers reviewed the suspects' names and photographs, the layout of the apartment, and the nature of the charges for which the warrants were issued.

Upon arrival, the task force established a perimeter around the defendant's apartment, which was a two-story end unit with front and rear entrances. The officers were outfitted in bulletproof tactical vests labeled "Police," "Probation," or "Parole," clearly identifying them as law enforcement personnel. Masterson, Chalker, Mills,

---

[4] Chalker and McMahon testified that they were not officially deputized members of the task force, but they had been assigned to work with the task force that day.

and Taylor were assigned to enter the residence and search for the defendant and his son. The entry team approached the front door, repeatedly knocked loudly and announced their presence. During this time, Masterson and Mills observed an individual, whom they recognized as the defendant, looking out of one of the upstairs windows.

After about five minutes had passed with no response, the officers decided to use force to enter the residence. Mills attempted to open the front door with a battering ram but inadvertently jammed the door shut. A woman, later identified as the defendant's wife, tried unsuccessfully to open the front door, and then let the officers in through the apartment's rear entrance. The officers showed the defendant's wife a photograph of the defendant and asked whether he was inside the residence. She nodded and pointed upstairs. When the officers called for anyone upstairs to come down, an adult male and two children did so, but neither the defendant nor his son appeared. The officers determined that they would need to clear the second floor.

While McMahon remained downstairs with the defendant's wife and the other individuals, Masterson led Chalker, Mills, and Taylor upstairs, where they began searching each room. Masterson carried a ballistic shield and the other officers had their guns drawn. After clearing the bathroom, Masterson provided cover in the hallway while Chalker, Mills, and Taylor entered the first bedroom, which was small and cluttered with a bed, a nightstand, and a dresser. There was a large pile of clothing on the floor at the foot of the bed. While Taylor stood guard, Mills opened the closet door, and Chalker climbed onto the bed and began searching the clothing pile, which was almost the same height as the bed.

As he moved aside articles of clothing, Chalker uncovered what appeared to be part of a person's body and

yelled, " 'show me your hands.' " Hearing no response, Chalker grabbed the person's hand, saw his face, and recognized the defendant. Chalker, standing on the "squishy" bed, began pulling the defendant out of the clothing pile, while instructing him that he was under arrest. Although the defendant resisted by making himself "dead weight," Chalker was able to place one handcuff on his wrist. As Chalker pulled the defendant onto the bed, however, the defendant lunged at him, causing Chalker to fall backward and land on the adjacent nightstand, which was adorned with a pointed metal prong. After Mills and Taylor finished handcuffing the defendant, removed him from the bedroom, and called for assistance for Chalker, they continued their search and found the defendant's son hiding in the same pile of clothing. Chalker was taken to the hospital, where he was diagnosed with a traumatic pneumothorax and multiple rib fractures.

The defendant was subsequently charged in a substitute information with one count of assault of public safety personnel in violation of § 53a-167c (a) (1), and one count of interfering with an officer in violation of § 53a-167a (a). The jury returned a verdict of guilty on both counts, and the trial court sentenced the defendant to a total effective sentence of eight years of incarceration, followed by two years of special parole. The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the trial court improperly had admitted into evidence (1) testimony naming the warrant charges, and (2) testimony identifying the "Violent Fugitive Task Force" as the particular task force that executed that warrant. *State* v. *Delacruz-Gomez*, 218 Conn. App. 260, 262–63, 291 A.3d 609 (2023). The Appellate Court affirmed the trial court's judgment, concluding that the evidence was relevant and that its probative value outweighed its prejudice to the defendant. Id., 277, 281. This certified appeal followed. Additional

facts and procedural history will be set forth as necessary.

We begin by setting forth the following well established principles that apply to both of the defendant's evidentiary claims. "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. This balancing inquiry is necessary "to militate against the risk that the attention of a jury may be distracted from consideration of the proof of the charges at hand, and, instead, and for improper reasons, fix the defendant's guilt on evidence of marginal evidentiary value." (Internal quotation marks omitted.) *State* v. *Raynor*, 175 Conn. App. 409, 450–51, 167 A.3d 1076 (2017), aff'd, 334 Conn. 264, 221 A.3d 401 (2019). Accordingly, this court has identified four situations in which "the potential prejudicial effect of relevant evidence would suggest its exclusion." (Internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 398, 844 A.2d 810 (2004). "These are: (1) [when] the facts offered may *unduly* arouse the [jurors'] emotions, hostility or sympathy, (2) [when] the proof and answering evidence it provokes may create a side issue that will *unduly* distract the jury from the main issues, (3) [when] the evidence offered and the counterproof will consume an *undue* amount of time, and (4) [when] the defendant, having no reasonable ground to anticipate the evidence, is *unfairly* surprised and unprepared to meet it." (Emphasis in original; internal quotation marks omitted.) Id. "[T]he primary responsibility for conducting the balancing test to determine whether the evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omitted.) Id., 396. "On review

by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *James K.*, 347 Conn. 648, 668, 299 A.3d 243 (2023).

I

The defendant first argues that the names of the warrant charges should not have been admitted because they had little probative value and were unduly prejudicial, portraying him as a "violent, dangerous individual" who was likely to have assaulted Chalker. We conclude that the Appellate Court correctly held that the trial court did not abuse its discretion by admitting the names of the warrant charges.

The following procedural facts are relevant to our resolution of this issue. Before the evidentiary phase of the trial began, the state filed a notice of its intent to introduce evidence of uncharged misconduct pursuant to § 4-5 (c) of the Connecticut Code of Evidence. Specifically, the state indicated that it would elicit testimony that, on the morning of the defendant's arrest, the members of the task force were "in possession of an arrest warrant charging the defendant with . . . assault in the first degree and criminal possession of a firearm."[5] The defendant filed an objection to the introduction of the evidence not on the grounds that the evidence lacked relevance or probative value but, rather, on the basis that it was inflammatory and would lead the jury to conclude that he had a propensity for violence. During oral argument on the objection, the prosecutor maintained that the names of the charges were necessary to explain the officers' conduct during their entry, including the use of the ballistic shield and holding the defendant at gunpoint. Specifically, the prosecutor contended that the names of the charges

_____

[5] We note that the prosecutor did not attempt to introduce evidence of the other charges in the warrant.

were relevant to prove that the officers acted in the performance of their duties, to corroborate crucial prosecution testimony, and to "[complete] the story." Defense counsel argued that the names of the charges were unduly prejudicial because the charge of assault in the first degree was similar to the charge being tried, namely, assault of public safety personnel. Therefore, defense counsel argued, the evidence was potentially confusing, and there was a serious risk that the jury would treat it as propensity evidence. In the event that the court decided to admit the evidence, defense counsel asked the court to instruct the jury that it should not be concerned with the nature of the charges, whereas the prosecutor argued that an instruction that the charges could not be used to infer propensity would be sufficient.

The court ruled that the names of the warrant charges were admissible, stating: "From the argument[s] that I heard from both parties, it would appear to be relevant evidence on the charge of interference. It goes to the reasonable belief of the officers, and it does . . . help establish the prosecution testimony, as well as complete the story of why they're there. I do find, listening again to the argument[s] of both parties, that it would appear to be more probative than prejudicial, and that any prejudice could be eliminated through an appropriate jury charge." The court also notified the parties that it would give the standard jury instruction on uncharged misconduct but invited counsel to submit any proposed modifications. Four of the state's witnesses subsequently testified as to the nature of the charges in the defendant's warrant.

The Appellate Court upheld the trial court's ruling, reasoning that the warrant charges "provided an explanation for the manner in which the officers conducted themselves while they were at the apartment," for the purpose of establishing that they were acting in the

performance of their duties. *State* v. *Delacruz-Gomez*, supra, 218 Conn. App. 273–74. The court also determined that any risk of undue prejudice was mitigated by the trial court's limiting instruction and by the fact that the jury did not hear the details of the warrant charges. Id., 275–77.

"[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 582, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). "We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (c) of the Connecticut Code of Evidence]." (Internal quotation marks omitted.) Id. Specifically, that provision allows evidence of other crimes, wrongs, or acts to be admitted "to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (c). "Second, the probative value of the evidence must outweigh its prejudicial effect." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 582.

As the Appellate Court observed, the state "bore the burden of demonstrating that the officers were 'acting in the performance of [their] duties' to prove the elements of the charged offenses of assault of public safety personnel and interfer[ing] with an officer."[6] *State* v.

[6] "A person is guilty of assault of public safety, emergency medical, public transit or health care personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties

*Delacruz-Gomez,* supra, 218 Conn. App. 273. In *State* v. *Davis,* 261 Conn. 553, 804 A.2d 781 (2002), this court concluded that a defendant was not entitled to raise the defense of self-defense to a charge of either interfering with or assault of a peace officer. Id., 574. Instead, "the proper defense to those charges in cases in which the defendant claims that the police officer had used unreasonable and unnecessary physical force is that the police officer was not acting in the performance of his duty." Id. In reaching that conclusion, the court noted that a police officer's use of physical force during the course of an arrest must be reasonable to fall within the scope of the officer's duties. Id., 572; see also *State* v. *Baptiste,* 133 Conn. App. 614, 627, 36 A.3d 697 (2012) (reasonable force is inherent component of whether police officers are acting in performance of their duties), appeal dismissed, 310 Conn. 790, 83 A.3d 591 (2014). This court made clear in *Davis* that a defendant who presents evidence that an officer was not acting in the performance of his duties—no matter how weak or incredible—is entitled, in lieu of an instruction on self-defense, to an instruction that the officer's use of physical force must have been reasonable under the circumstances for that officer to have been acting in the performance of his duties. *State* v. *Davis,* supra, 571–72.[7]

---

. . . such person causes physical injury to such peace officer . . . ." General Statutes (Supp. 2016) § 53a-167c (a).

"A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . or firefighter in the performance of such peace officer's . . . or firefighter's duties." General Statutes (Rev. to 2015) § 53a-167a (a).

[7] Before a trial court admits evidence under § 4-5 (c) of the Connecticut Code of Evidence for the limited purpose of allowing the state to explain the reasonableness of a police officer's use of force in a prosecution for interfering with an officer or assault of public safety personnel, it should have a basis for concluding that the defendant has challenged the reasonableness of that force or intends to do so. In the present case, defense counsel promptly raised this issue by repeatedly asking Chalker, the state's second witness, if he had struck the defendant with his gun. It is not surprising, therefore, that defense counsel chose not to contest the relevance of the

In the present case, the names of the warrant charges explained why the amount of force the officers used in effectuating the defendant's arrest was reasonable. They were relevant, therefore, to the jury's determination that the members of the task force were acting in the performance of their duties. The defendant has not disputed the relevance of the charges but, rather, claims that the trial court should have allowed into evidence only the fact that the task force was at the residence to serve a warrant. Unlike the mere fact of an arrest warrant, however, the names of the charges are what explained why the officers used significant, extensive force in the form of precautionary measures—such as entering the home with a battering ram, carrying a ballistic shield, and drawing their weapons while searching for the defendant and his son—that, under different circumstances, a jury may have found to be unreasonable. Although the reasonable use of force is not itself an element of either offense, evidence establishing why the amount of force used was necessary is relevant to the state's burden of proving that the officers were acting in the performance of their duties, because, as we made clear previously in this opinion, the officers would not have been doing so if they had used unnecessary or unreasonable force while arresting the defendant.[8]

warrant charges when the prosecutor argued at the outset of trial that their admission was necessary to explain the officers' use of force.

[8] The trial court did not give a "reasonable force" instruction as to the assault of public safety personnel charge. Although the defendant does not claim on appeal that the failure to give that instruction was improper, he argues that its omission diminished the probative value of the warrant charges. Such an instruction—which the defense did not request—would have specified that the reasonableness of Chalker's use of force was relevant to whether he was acting in the performance of his duties. Although the court did not explicitly connect the reasonableness of Chalker's use of force to the performance of his duties when it instructed the jury on the assault charge, it did do so for the same element when it instructed the jury on the interference charge, which followed the assault instruction. Moreover, defense counsel conceded during his closing argument that Chalker had been acting in accordance with his official duties. We therefore agree with

Our conclusion that the evidence was relevant and had probative value does not end our inquiry. That probative value must outweigh any prejudicial effect, which, the defendant argues, included improperly suggesting that he had a propensity for violence, arousing the emotions and hostilities of the jurors, and inviting the jurors to speculate about the facts underlying the warrant charges. This court has previously stated that, "[when] the prior crime is quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility." (Internal quotation marks omitted.) *State* v. *Graham*, 200 Conn. 9, 12, 509 A.2d 493 (1986). In the present case, therefore, in which the defendant has been charged with assault of public safety personnel, and the warrant charged the defendant with assault in the first degree, a "strong showing of probative value" is required. (Internal quotation marks omitted.) Id.

Under the circumstances of the present case, the probative value of this evidence was sufficiently strong. As we explained previously in this opinion, the names of the warrant charges were relevant to an inherent component of an element of both offenses with which the defendant was charged, namely, that the officers were acting in the performance of their duties.[9] Our review

the defendant's candid admission in his reply brief to the Appellate Court that, under the facts of this case, any error in omitting the reasonable force instruction as to the assault charge was harmless beyond a reasonable doubt.

[9] The defendant claims that, because defense counsel conceded in his closing argument that Chalker and the other officers were acting in the performance of their duties, the names of the warrant charges were no longer probative as to that element. We agree that any probative value is significantly diminished when the evidence in question pertains to an undisputed element of the crime. See, e.g., *State* v. *Juan J.*, 344 Conn. 1, 33, 276 A.3d 935 (2022) (trial court erred in admitting evidence of uncharged misconduct to prove irrelevant issue); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.4.2, p. 151 (observing that "an adverse party's willingness to stipulate to a fact in order to obviate the need for prejudicial evidence should . . . be given due consideration").

of the record reveals that the sole basis for the officers' use of the battering ram, ballistic shield, and drawn weapons was the nature of the charges in the warrant. Furthermore, defense counsel cross-examined multiple officers regarding their use of force against the defendant, and the defendant and his son testified that one of the members of the task force had restrained and beaten the defendant, making the officers' use of force a contested issue at trial. In light of that testimony and the relevance of the warrant charges to establishing the reasonableness of the use of force—which, in turn, was relevant to proving the "performance of duties" element of both offenses—the "strong showing of probative value" called for in *State* v. *Graham*, supra, 200 Conn. 12, has been made.

Although we recognize the heightened risk of undue prejudice, given that some form of assault was charged in both the warrant and the case being tried, the trial court mitigated the potential prejudice in several ways. The court did not allow the jury to hear any details of the alleged conduct that gave rise to the warrant charges. Accordingly, the jury was unable to compare the cases in a way that we have previously cautioned is likely to bring about undue prejudice. There was no evidence, for instance, that the conduct charged in the warrant was more egregious than the defendant's alleged assault of Chalker. See *State* v. *Campbell*, 328 Conn. 444, 522–23, 180 A.3d 882 (2018) ("prejudicial impact of uncharged misconduct evidence is assessed in light of its relative 'viciousness' in comparison with the charged conduct").

This concession, however, was not made until defense counsel's closing argument, long after the court ruled on the admissibility of the evidence. Before that time, defense counsel provided no indication that he planned to concede this element. To the contrary, defense counsel cross-examined Chalker and Mills about their use of force at the defendant's residence, advancing the allegations that one of the officers struck the defendant with his pistol, and later eliciting testimony from both the defendant and his son that one of the officers had used excessive force.

The jury, moreover, could not identify factual similarities that might suggest a common perpetrator. See *State* v. *Raynor*, 337 Conn. 527, 563–65, 254 A.3d 874 (2020) (increased risk of undue prejudice when evidence highlights shared characteristics between uncharged misconduct and offense being tried). Because the officers' testimony was limited to stating the relevant charges for the purpose of explaining their conduct during the execution of the warrant, the jury did not hear the kind of graphic details that could have prevented it from properly weighing the evidence. See, e.g., *State* v. *Morlo M.*, 206 Conn. App. 660, 693–94, 261 A.3d 68 (emphasizing that prior misconduct evidence alleged by defendant to be unduly prejudicial "did not involve gruesome details, facts or photographs" and that trial court had given appropriate limiting instruction as to its use), cert. denied, 339 Conn. 910, 261 A.3d 745 (2021).

The court also mitigated the potentially undue prejudice by intervening when defense counsel began to cross-examine Chalker about the outcome of the warrant charges. After defense counsel began this line of questioning, the court excused the jury, then cautioned defense counsel that his questioning could open the door to further exploration of the details of the warrant charges. Defense counsel responded that he intended to call into question Chalker's knowledge of the facts underlying the warrant charges, thus casting doubt on the suggestion that the defendant was a violent felon. While recognizing that defense counsel was free to conduct cross-examination as he saw fit, the court offered, as an alternative, to provide a cautionary instruction regarding the warrant charges and directed Chalker not to discuss the underlying facts relating to the warrant charges. Defense counsel withdrew the question and agreed to the court's proposal to give a limiting instruction.

The limiting instructions that the court gave as a result of this colloquy, as well as the court's final instructions, lessened any potential undue prejudice from the admission of this evidence.[10] The first instruction emphasized that the defendant enjoyed the presumption of innocence and that the officers' testimony about the charges "reflect[s] their preparation for the service of a . . . warrant that charges a violent felony . . . nothing more." The court further advised the jury that the execution of the warrant did not mean that the defendant committed the offense and that "[t]he details involved in that warrant are not pertinent to this, not relevant, and should not be considered by you." The court's final instruction stated explicitly that the jury was not to "consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged, or to demonstrate a criminal propensity." Rather, the jury could use the evidence if it "logically, rationally, and conclusively supports the issue for which it is being offered by the state, but only as it may bear on the issue of reasonableness of force as used by the peace officers." The court further clari-

---

[10] The defendant claims that these instructions failed to reduce the prejudicial impact of the evidence because the court did not give an instruction during the testimony of Masterson, Mills, or Taylor. He then undermines this claim, however, by arguing that the instruction given during Chalker's testimony—which he now contends should have been repeated during the testimony of Masterson, Mills, and Taylor—unnecessarily highlighted the severity of the warrant charges. We find these arguments unpersuasive. The first limiting instruction referred to the *officers'* testimony, making clear that it applied to the testimony of multiple witnesses and not only to that of Chalker. That instruction must be understood in conjunction with the limiting instruction that the court provided in its final charge to the jury, which, likewise, encompassed all instances in which the state offered evidence pertaining to the warrant charges. See, e.g., *State* v. *Blaine*, 334 Conn. 298, 308, 221 A.3d 798 (2019) ("individual instructions are not to be judged in artificial isolation from the overall charge" (internal quotation marks omitted)). The court's instructions, therefore, appropriately alerted the jury as to the limited purpose for which this evidence could be used, without unduly emphasizing that evidence.

fied that "[y]ou may not consider evidence of other misconduct of the defendant for any purpose other than the one I've just told you, because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct . . . . [Y]ou may consider this evidence only on the issue of reasonableness of force used, and for no other purpose."

"Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct." *State* v. *Ryan*, 182 Conn. 335, 338 n.5, 438 A.2d 107 (1980). In the absence of an indication to the contrary, we presume that the jury followed the court's instructions and considered this evidence solely for the purpose for which it was admitted. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 429, 267 A.3d 81 (2021); see also *State* v. *Pereira*, 113 Conn. App. 705, 715, 967 A.2d 121 (limiting instructions, which were presumed to have been followed, "lessen any prejudice resulting from the admission of [evidence of prior misconduct]" (internal quotation marks omitted)), cert. denied, 292 Conn. 909, 973 A.2d 106 (2009). On the basis of the foregoing record, we are satisfied that the court's handling of the evidence at issue effectively mitigated the risk of undue prejudice.[11]

In sum, because the probative value of the evidence was strong and the trial court undertook sufficient measures to mitigate any potential undue prejudice, the Appellate Court correctly concluded that, on the basis of the facts of the present case, there was no abuse of discretion in admitting the names of the charges listed in the warrant.

---

[11] We emphasize, however, that, because of the nature of the warrant charges and the limited purpose for which they were admitted, the trial court should also have considered further mitigating the prejudicial impact by limiting the number of references to those charges during testimony.

## II

We turn next to the defendant's claim that the trial court abused its discretion in admitting testimony that the defendant had been arrested by the "Violent Fugitive Task Force."[12] Specifically, the defendant contends that any probative value of the name of the task force was outweighed by its prejudicial effect. We conclude that the testimony regarding the name of the task force had no probative value and was unfairly prejudicial. Because the defendant has failed to satisfy his burden of showing that the error was harmful, however, we affirm the Appellate Court's judgment.

After the trial court overruled the defendant's objection to the state's motion seeking to introduce testimony naming the warrant charges, defense counsel orally moved to exclude evidence "that these police officers and this federal marshal were part of this Violent [Fugitive] Task Force . . . this special task force for violent offenders." He argued that allowing the jury to hear the name of the task force would be highly prejudicial and that it would be sufficient for the officers to testify that

---

[12] Given the significance of the name of the task force to this appeal, we make the following observations. Throughout trial, the parties and witnesses used inconsistent terminology to describe the task force. Defense counsel, for instance, referred to it as the "Violent Gang Task Force," whereas one of the prosecutors called it the "Violent Felony Task Force." Although the United States Marshals Service manages various task forces responsible for the apprehension of dangerous fugitives, the names of these task forces vary by jurisdiction. See U.S. Marshals Service, Fugitive Task Forces, available at https://www.usmarshals.gov/what-we-do/fugitive-investigations/fugitive-task-forces (last visited July 24, 2024); U.S. Marshals Service, District Offices, https://www.usmarshals.gov/local-districts (last visited July 24, 2024).

Three of the state's witnesses, Chalker, McMahon, and Taylor, used the phrase "Violent Fugitive Task Force." We note that two other witnesses, however, Mills and Masterson, the lone United States marshal who participated in the arrest, referred to the task force simply as the "Fugitive Task Force." The language to which the defendant has objected—"Violent Fugitive Task Force"—was the predominant usage during trial, and that is the name we use throughout this opinion.

they reported to the defendant's home as part of a task force to execute an arrest warrant. The prosecutor objected, claiming that the name of the task force explained "why they were there" and "the manner in which they serve the warrant." The court denied the motion, concluding that the name of the task force was "relevant and probative" because it was "an acronym" used to identify it, and suggesting that defense counsel could "explore it on cross-examination regarding any prejudice you think might exist because of the name of the unit. It's simply identifying themselves, and . . . the court feels that that's relevant and probative."[13] Five officers representing multiple agencies subsequently testified that they had been assigned to the task force when they executed the arrest warrants for the defendant and his son. The officers also testified as to the purpose of the task force and its role in apprehending individuals wanted for violent felonies.

The Appellate Court upheld the trial court's ruling on the ground that "the officers' brief testimony about the name and purpose of the Violent Fugitive Task Force, like the evidence regarding the charges against the defendant, was relevant to the issue of whether Chalker and the other officers were acting in the performance of their duties." *State* v. *Delacruz-Gomez*, supra, 218 Conn. App. 279. The court reasoned that the name of the task force "provided an explanation for why Chalker and the other officers were at the defendant's apartment" and "helped explain, even if only to a slight degree, why the officers executed the arrest warrants in the manner that they did, including why they had their weapons drawn when they searched the apart-

_____

[13] We emphasize that, even when a trial court finds that the evidence in question is relevant and material, it should articulate on the record its reasons for determining that the probative value of the evidence outweighs any prejudicial impact. See, e.g., *State* v. *Sierra*, 213 Conn. 422, 434–36, 568 A.2d 448 (1990).

ment." Id., 280. Moreover, the court stated that the testimony relating to the task force was "not likely to arouse the emotions of the jurors any more than the testimony about the nature of the charges in the defendant's arrest warrant . . . ." Id.

From the outset, we are unable to discern how the name of this task force is relevant to any material fact, particularly given the varied titles that were used to describe it during trial. See footnote 12 of this opinion. Indeed, we are hard-pressed to conceive of *any* scenario in which the name of the responding task force would be relevant to proving that its use of force was reasonable. To the extent that it was necessary to explain the presence of the task force, testimony that multiple agencies were involved in executing the warrant and that members of the task force had received specialized training would have been sufficient. The state's argument with respect to the probative value of this evidence is largely duplicative of its argument relating to the names of the warrant charges. Indeed, at oral argument before this court, the state conceded that the name of the task force did not "offer anything significantly more probative" than the warrant charges. But, although the nature of the warrant charges explained the reasonableness of the use of force under the circumstances and, thus, was probative of an element of both crimes charged in the present case—that is, whether the officers were acting in the performance of their duties—the name of the task force had no such probative value. The particular name of the task force assigned to apprehend the defendant was wholly immaterial to any issue in the case.

In addition, the name of the task force presented a significant risk of undue prejudice because it suggested that the defendant was a violent fugitive. Specifying that the "Violent Fugitive Task Force" was assigned to arrest the defendant unavoidably implied that he was

actively attempting to evade law enforcement.[14] Black's Law Dictionary defines "fugitive" as "[s]omeone who flees or escapes; a refugee," or, more specifically, "[a] criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony, [especially] by fleeing the jurisdiction or by hiding." Black's Law Dictionary (12th Ed. 2024) p. 809. The court made no finding, and the state did not introduce any evidence, that the defendant had fled or otherwise tried to escape arrest. Consequently, there appears to be no legal basis for the usage of this terminology, which invited the jurors to speculate on facts not in evidence and was likely to arouse their emotions in a prejudicial fashion. We are concerned by the implication that a prosecutor may arbitrarily characterize a defendant as a "fugitive" by introducing the name of a self-styled task force into evidence, then use that subjective title to justify the conduct of a law enforcement unit, and we decline to countenance that practice here.[15]

On this record, therefore, we do not share the Appellate Court's confidence that the name of the task force was no more likely to arouse the hostilities of the jurors

---

[14] We recognize that the name of the task force also included the term "violent." The implication that the defendant was "violent," however, was addressed through the admission of the warrant charges, as the court properly instructed the jury that the defendant maintained his presumption of innocence as to those charges, as well as the charges in the present case, and that it was not to infer any criminal propensity from that evidence. Accordingly, we focus our discussion primarily on the prejudicial impact of the term "fugitive." See *State* v. *James G.*, supra, 268 Conn. 400 (evidence is less likely to arouse jurors' emotions when similar evidence already exists).

[15] We likewise find unpersuasive the trial court's rationale that the members of the task force were "simply identifying themselves . . . ." This reasoning risks the inclusion of inflammatory language under the pretext of identification. It is not difficult to envision a scenario in which the name of a law enforcement unit could be used as a vehicle to introduce information about gang activity, terrorism, or other misconduct that might otherwise be precluded by our rules of evidence.

than the names of the warrant charges. See *State* v. *Delacruz-Gomez*, supra, 218 Conn. App. 280. The name of the task force includes the same allusion to violent crime but adds the inflammatory label of "fugitive," which is not rooted in any legal ruling or factual finding in the present case, has no independent probative value, and is highly prejudicial. The state contends that, because the jury had already heard the names of the warrant charges, it would not have been surprised to hear that a task force for "[v]iolent [fugitives]" was assigned to execute the warrant. The fact that the defendant had been charged with assault in the first degree and criminal possession of a firearm, however, does not suggest that he was a "fugitive." That characterization originated with, and was limited to, the name of the task force. Moreover, the trial court failed to mitigate the risk of undue prejudice by giving a limiting instruction on the name of the task force, as it did for the names of the warrant charges, or by limiting the number of references during testimony. For all these reasons, we disagree with the Appellate Court's conclusion that the trial court properly admitted testimony identifying the name of the task force. See *State* v. *Delacruz-Gomez*, supra, 280–81.

We are not persuaded, however, that the admission of this evidence was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . [T]he proper standard

for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Bouknight*, 323 Conn. 620, 626, 149 A.3d 975 (2016).

Given the strength of the state's case—including, but not limited to, evidence that Chalker's injuries were caused by the defendant's attempts to prevent him from performing his duties—and the defense's strategic decision to focus exclusively on whether the defendant caused Chalker's injuries, we conclude that the jury's verdict was not substantially swayed by the admission of the name of the task force. The testimony of the state's witnesses indicates that, from the moment the task force arrived at his residence, the defendant deliberately hindered the officers' efforts to carry out their duties. Multiple members of the task force testified that they knocked on the apartment door for at least five minutes with no response before the defendant's wife let them in through the rear entrance, and that, during that time, they saw the defendant looking at them from an upstairs window. Rather than surrendering when the task force entered the residence, however, the defendant admitted that he hid himself and his son under a pile of clothes in an upstairs bedroom. Chalker testified that, when he located the defendant and directed him to show his hands, there was no response. Both Chalker and Taylor also described how the defendant resisted by making himself "dead weight" as Chalker tried to pull him out of the clothing pile to effectuate the arrest. Most significant, Chalker, Mills, and Taylor all testified that the partially handcuffed defendant lunged at Chalker as the defendant was being pulled from the clothing pile, causing Chalker to fall backward and land on the nightstand.[16]

---

[16] Masterson waited in the upstairs hallway while Chalker, Mills, and Taylor cleared the bedroom and, as a result, did not see whether the defendant struck Chalker. He testified, however, that the other officers told him that

Any differences in the officers' testimony were limited to details such as the extent to which the defendant used the wall as leverage, the manner by which he knocked Chalker off balance, and the point in time at which Chalker first climbed onto the bed. For example, Mills and Taylor both described seeing the defendant pushing off the wall as Chalker pulled him out of the clothing pile and, then, Chalker flying backward off the bed. Chalker testified that the defendant's head and shoulder struck him in the chest but that he did not know if the defendant's feet were on the floor or the wall when the defendant lunged at him, and Taylor testified simply that the defendant "pushed" Chalker. Although Chalker stated that he got onto the bed before searching through the clothing pile, Mills recalled that he did not do so until after he saw the defendant hiding there. There was no disagreement among the officers, however, that the defendant's actions while resisting arrest caused Chalker to fall off the bed and to sustain his injuries. See *State* v. *Nixon*, 32 Conn. App. 224, 238, 630 A.2d 74 (1993) (noting that "a person is guilty under § 53a-167c (a) (1) if he intends to prevent a reasonably identifiable [peace officer] from performing his duty and, in doing so, causes injury to the [peace officer]"), aff'd, 231 Conn. 545, 651 A.2d 1264 (1995).

The jury reasonably could have credited the officers' testimony, which was consistent as to the essential facts of the incident, as opposed to the contradictory narrative advanced by the defense. At trial, the defense claimed that Mills, not Chalker, entered the bedroom alone, pulled him out of the clothing pile, and began pistol-whipping him before being told by another officer to stop. The defendant denied resisting arrest and claimed that he had no idea until hours later that an

---

the defendant's resistance caused Chalker's injuries, and that his report thus reflected that Chalker was hurt when "the [defendant] jumped up," causing Chalker to "[fall] back and [strike] a nightstand."

officer had been hurt at the apartment. This assertion strains credulity, as all of the testifying members of the task force recalled Chalker's injury—Mills even testified that he heard Chalker scream out in pain—and hospital records confirmed that Chalker sustained fractured ribs and a traumatic pneumothorax. The defendant's son similarly testified that he heard the defendant being beaten by a police officer but that he did not hear anyone fall off the bed.[17] During his closing argument, however, defense counsel stated that, contrary to the defendant's testimony, Chalker *had* been in the room but was injured because he lost his balance and fell off the bed, and suggested that the defendant "didn't know what was happening . . . ." In arguing that Chalker had simply slipped, defense counsel informed the jury that it was "reasonable to find [the defendant] guilty of interfering with a police officer," and that the officers were acting in the performance of their duties, asking the jury to concentrate, instead, on the causation element of the assault charge. This defense strategy ensured that causation was the only contested issue remaining before the jury, and the state presented a strong case that the defendant's actions in resisting arrest caused Chalker's injuries.[18]

---

[17] Other than this testimony, there was no evidence that any law enforcement officer struck the defendant, and there was no evidence to suggest that any of the officers had entered the bedroom alone.

[18] Because neither Masterson's report nor the hospital report indicates that the defendant knocked Chalker off the bed, the defendant claims that his characterization as a "violent fugitive" likely led the jury to conclude that he did so. We disagree. The hospital report indicates that Chalker "was standing on a bed . . . while taking someone into custody, and as he was pulling them, he fell off the bed . . . ." Chalker testified, however, that he had, in fact, told hospital staff that he had been "knocked off the bed" but that he had no control over how the report was ultimately written. Masterson testified at length as to what he included in his report and why. As the trial court observed, defense counsel had the opportunity to cross-examine the officers and did so. The jury reasonably could have credited Masterson's explanation for his language and Chalker's testimony about what he had told the hospital staff.

On the basis of the foregoing, it is unlikely that hearing the name of the task force is what persuaded the jury of the defendant's guilt. The state presented a strong case supported by eyewitness testimony from several law enforcement officers, all of whom connected the defendant's uncooperative behavior and resistance to arrest with Chalker's subsequent injuries. The name of the task force did not bolster the credibility of the officers, whose testimony was critical to the state's case. Moreover, given that the defendant's testimony was so erratic that his own counsel rejected his version of events, there is no reason to believe that the jury would have found him credible but for the discussion of the task force. Although the prosecutor mentioned the name of the task force in his closing argument, he did so only twice while discussing the state's legal responsibility for executing the warrant, not as a means of characterizing the defendant. This is hardly the "frequent and repeated emphasis" on inadmissible evidence that this court has previously recognized as incompatible with harmless error. *State* v. *Culbreath*, 340 Conn. 167, 195, 263 A.3d 350 (2021). Under these circumstances, we cannot conclude that the admission of the name of the task force, although inappropriate, had any bearing on the question before the jury—whether the defendant, in fact, had caused Chalker's injuries—and we are satisfied beyond a reasonable doubt that the result would have been the same if that evidence had not been introduced. See, e.g., *State* v. *Jordan*, 314 Conn. 89, 104, 101 A.3d 179 (2014). Accordingly, we will not disturb the Appellate Court's decision.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.